**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PERCY HUTTON,** | : | **CASE  NO.  1:05CV2391** |
| | : | |
| **Petitioner,** | : | |
| | : | **JUDGE CHRISTOPHER A. BOYKO** |
| **vs.** | : | |
| | : | |
| **BETTY MITCHELL, Warden,** | : | |
| | : | **MEMORANDUM OF OPINION** |
| **Respondent.** | : | |

This matter is before the Court upon Petitioner Percy Hutton's ("Hutton" or "Petitioner")

Amended Petition for Writ of Habeas Corpus.

Pursuant to 28 U.S.C. § 2254, Petitioner filed an Amended Petition for Writ of Habeas

Corpus, challenging his conviction and sentence of death rendered by an Ohio court.  (ECF No.

60.)  The Respondent, Warden Betty Mitchell ("Respondent"), filed a timely Return of Writ,

and Hutton filed an Amended Traverse.  (ECF Nos. 64 and 66, respectively.)

For the following reasons, the Amended Petition for Writ of Habeas Corpus is denied.

## I.      Factual History

On October 16, 1985, a Cuyahoga County Grand Jury issued a five-count Indictment against Hutton.  The Indictment charged Hutton with two counts of murdering Derek Mitchell ("Mitchell") in violation of Ohio Revised Code § 2903.01.  The first count charged that he committed the murder with prior calculation and design pursuant to Ohio Revised Code § 2903.01(A).  The second charged him with murdering Mitchell while committing, attempting, or fleeing the commission or attempted commission of kidnapping, pursuant to Ohio Revised Code § 2903.01(B).  Each murder count carried one firearm specification, Ohio Revised Code § 2929.71(A), and two capital specifications: a course-of-conduct specification, Ohio Revised Code § 2929.04(A)(5), and a felony-murder specification of kidnapping, Ohio Revised Code § 2929.04(A)(7).  Hutton also was indicted for kidnapping Mitchell and Samuel Simmons Jr. ("Simmons"), in violation of Ohio Revised Code § 2905.01, and for the attempted murder of Simmons, in violation of Ohio Revised Code § 2911.11.  Each count carried a firearm specification.  Hutton entered a plea of not guilty to all charges.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Hutton's direct appeal of his convictions and sentence:

> On Friday, September 13, or Saturday, September 14, 1985, Percy "June" Hutton confronted Samuel Simmons, Jr. outside Simmons's home and accused him of stealing a sewing machine belonging to Hutton. Claiming that he had seen Simmons's friend Derek "Ricky" Mitchell trying to sell the machine, Hutton demanded that Simmons give the machine back immediately. Simmons suggested that Hutton "go talk to Ricky."
>
> When Mitchell arrived, Hutton went upstairs with him. When they came back down, according to Simmons, Hutton said that "it wasn't what he was looking for and if he found out we had anything to do with what was missing or

2

stolen he was going to kill us."

The following Monday morning, September 16, Hutton went back to Simmons's home at about 12:00 a.m. and asked him to work on a car. Hutton and Simmons got into Hutton's car, where Bruce Laster was waiting for them. When he got in, Simmons saw a .22 caliber rifle on the back seat. Hutton drove them to Mitchell's house saying, "I want to talk to you and Ricky, man." When they arrived, Simmons told Mitchell that "June wanted to talk to him."

After accusing Mitchell of stealing tires from Hutton's back yard, Hutton demanded the return of his sewing machine, in which he had hidden $750. Mitchell denied taking the machine. Hutton insisted that Mitchell had tried to sell the machine to a Mr. Evans and demanded that Mitchell come with him to Evans's house. According to Simmons, Hutton said: " * * * If Evans said you ain't the one who tried to sell him the sewing machine, * * * I will apologize. If he say you tried to sell the sewing machine, that mean I'm f---ing you up. * * * "

Mitchell and Simmons got into the car. Hutton pointed the rifle at Simmons's side and said that he didn't appreciate Simmons and others breaking into his sister's house.

Instead of going to Evans's house, Hutton drove to a parking lot behind a bus depot on 93rd Street. He ordered Mitchell out of the car. Mitchell and Hutton walked away from the car so that Simmons could not hear their conversation, but he saw Hutton put a pearl-handled, nickel-plated, .22 caliber automatic pistol to Mitchell's head.

Hutton and Mitchell returned to the car. Following Mitchell's directions, Hutton drove to a building on 30th Street. Hutton and Mitchell went inside for a few minutes and emerged with a white sewing machine case.

Hutton drove to his mother's house, took the case inside, and returned to the car. Hutton drove a short distance and parked in an alley next to a brown El Dorado. Simmons got out. Hutton moved his car to the other end of the street. He then walked back to the El Dorado.

Simmons got behind the wheel as Hutton "went under the hood" and said, "Try to start it." He then walked back to Simmons and shot him twice in the head.

Simmons, unable to move, lay partly in and partly out of the car and cried for help. No one responded. He managed to get up and stagger to two nearby houses to seek aid. Hutton found him pounding on the back door of the second house and told him to get into the car. Telling Mitchell that someone had shot Simmons, Hutton then drove Simmons to St. Luke's Hospital.

3

At the hospital, Simmons asked Mitchell to go inside with him. Mitchell refused and said they were going to get the person "that did this to you." Simmons then got out of the car and went into the hospital by himself.

At 2:30 a.m., Mitchell, Hutton, and Laster returned to Mitchell's apartment. They woke Mitchell's alleged common-law wife, Eileen Sweeney, and, taking her to the hospital, they dropped her off and left. Sweeney went in to visit Simmons. Telling her that Hutton had shot him, Simmons sent her to warn Mitchell to get out of the car. She went outside, but the car had gone. She never saw Mitchell again.

Half an hour later, Hutton and Laster returned to the hospital. Hutton told Sweeney that Mitchell was home and offered to take her there. Instead, Hutton took Sweeney to a park, where he raped her vaginally and orally. Hutton had a small handgun with a white handle and a silver-colored barrel. During the rape, Hutton advised Sweeney to "forget about" Mitchell because "Ricky wasn't coming back."

After the rape, Hutton took Sweeney home. The door to the apartment had been damaged and the apartment was in disarray. Mitchell was not there. Too "scared and nervous" to drive, Sweeney accepted Hutton's offer to drive her to the home of Mitchell's sister LaWanda. Hutton accompanied Sweeney into LaWanda Mitchell's house. Sweeney testified that "[H]e told me, Ricky wasn't coming back, and if I told[,] someone would be looking for me."

On September 30, a decomposing corpse was found near the intersection of East 88th Street and St. Catherine Avenue, Cleveland. A large tire lay on the corpse. The autopsy disclosed that the body was Derek Mitchell's, and that Mitchell had been shot to death. Two bullets were recovered. A firearms expert identified them as .22 caliber long rifle ammunition that could have been fired from either a rifle or a handgun. The bullets that killed Mitchell had the same class characteristics as a bullet that had been removed from Simmons's head, but the expert could not tell whether all three had been fired from the same gun.

* * *

Hutton's defense was that Mitchell was not killed on September 16, but at some later time when Hutton was in Indianapolis. Denise Richardson testified that she saw Mitchell alive and spoke to him at about 3:00 p.m. on September 17, 1985, the day after the state claimed Mitchell was murdered. According to Hutton, he was in Indianapolis at the time Richardson spoke to Mitchell and stayed there until October 3, except for two brief visits to Cleveland on September 21 and 28. An employee of the Fall Creek branch of the Indianapolis YMCA saw Hutton there sometime after 4:00 p.m. on September 17. She

4

testified that he paid rent covering the period September 17 to October 3.

*State v. Hutton*, 53 Ohio St. 3d 36, 37-39, 559 N.E.2d 432, 436-38 (Ohio 1990).

**II.      Procedural History**

      **A.        State-Court Proceedings**

Hutton's trial commenced on January 3, 1986.  He was represented by Attorney Merlin Hill.  A jury returned a verdict of guilty as to all counts and the capital specifications on January 29, 1986.  The penalty phase of the trial commenced on February 3, 1986.  Two days later, on February 5, 1986, the jury recommended that Hutton be sentenced to death.  The trial court accepted the jury's recommendation and sentenced Hutton to death on February 7, 1986.

Hutton filed a timely appeal of the trial court's decision to the Eighth District Court of Appeals, represented by Attorney Floyd Oliver.  He raised fourteen assignments of error as follows:

I.      Death qualification of the guilt phase jury in a capital case violates the Appellant's Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution and Article I §§ 2 and 10 of the Ohio Constitution.

II.     Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I §§ 2, 9,10 and 16 of the Ohio Constitution.

III.    In violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I §§ 9 and 16 of the Ohio Constitution, the Appellant's sentence of death is inappropriate and disproportionate to similar cases.

IV.    The trial court erred in permitting the introduction of evidence of irrelevant prejudicial "other acts" of Appellant, and thereby deprived him of his rights to due process of law and to a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I § 16 of the Ohio Constitution.

V.     The trial judge abused his discretion by allowing into evidence a series of gruesome photographs which contained little probative value, thereby denying Appellant's constitutionally guaranteed right to a fair trial.

VI.     The trial court erred in limiting both re-direct and re-cross examination offered by
        defense counsel, thereby denying Appellant his United States and Ohio constitutional
        rights to a fair trial, due process of law, and confrontation.

VII.    Prosecutorial misconduct during trial and final argument to the jury denied Appellant his
        Fourteenth Amendment due process right to a fair and impartial trial.

VIII.   The trial court erred in overruling Appellant's motions for acquittal, which denied him
        due process of law, as guaranteed by the United States and Ohio Constitutions.

IX.     The trial judge erroneously instructed the jury to exclude consideration of bias, prejudice
        or sympathy for the accused, thereby depriving Appellant of evidence in mitigation and
        consideration of that mitigation in violation of the Sixth, Eighth and Fourteenth
        Amendments to the United States Constitution and Ohio Constitution Article I §§ 9 and
        16.

X.      The trial court and the prosecutor instructed the jury throughout the trial that their
        decision in the penalty phase is only a recommendation in violation of the Eighth and
        Fourteenth Amendments to the United States Constitution and Article I §§ 9, 10 and 16
        of the Ohio Constitution.

XI.     The trial court erred in dismissing a juror after the guilt phase but prior to the penalty
        phase, contrary to Ohio Criminal Rule 24(F) and R.C. § 2929.03(C)(2)(b), thereby
        denying Appellant his United States and Ohio constitutional rights to a fair trial and due
        process.

XII.    Ineffective assistance of counsel at trial deprived the Appellant of his right to effective
        assistance of counsel as guaranteed by the Ohio and United States Constitutions.

XIII.   Ineffective assistance at the penalty phase deprived Appellant of a fair and complete
        hearing as to the appropriate sentence, thereby denying Appellant of his rights as
        guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States
        Constitution and Article I §§ 9 and10 of the Ohio Constitution.

XIV.    The combination of errors occurring throughout both the guilt and the penalty phase
        deprived the Appellant of his constitutionally guaranteed right to a fair trial.

(App. to Return of Writ, vol. 3, 13-14.)[1]

---

        [1]       Hutton filed a second Notice of Appeal in the Eighth District Court of Appeals on
April 14, 1986.  The court of appeals dismissed that appeal as duplicative of his first appeal.  (App.
to Return of Writ, vol. 4, 2, 5.)

The Court of Appeals, in a split decision, reversed Hutton's conviction and sentence and remanded the case to the Common Pleas Court for further proceedings.  The majority opinion concluded that the following four assignments of error were well-taken and required reversal: the trial court's improper admission of "other acts" evidence, including Hutton's alleged rape of Eileen Sweeney; the trial court's improper restriction of defense counsel's ability to re-cross-examine and rehabilitate witness Mary Etta Pollard concerning Hutton's prior criminal charges; prosecutorial misconduct during trial and closing argument when prosecutors revealed Hutton's criminal history with regard to charged offenses that did not result in convictions; and the ineffective assistance of defense counsel at the penalty proceedings.  *State v. Hutton*, No. 51704, 1988 WL 39276, at **20, 22, 25, 29 (Ohio Ct. App. Apr. 28, 1988).  The majority opinion also found that the trial court erred in overruling Hutton's motions for acquittal on the charges of kidnapping and aggravated murder of Mitchell, although it determined that the trial court properly overruled Hutton's motion for acquittal with regard to the attempted murder and kidnapping of Simmons.  *Id*. at **12-15.  A concurring opinion, however, concluded that Hutton's conviction should be reversed on narrower grounds.  It agreed with the findings of error in the admission of Eileen Sweeney's testimony concerning the alleged rape and the ineffective assistance of defense counsel during the penalty phase of the trial.  It also concurred that the trial court erroneously restricted the scope of defense counsel's re-cross-examination of Mrs. Pollard, but did not find the error prejudicial.  It also disagreed with the finding of error in the trial court's overruling of Hutton's motions for acquittal, and found error with the court's admission of prejudicial photographs.  *Id*. at *32.  Finally, a dissenting opinion found no error in the two grounds the majority agreed warranted reversal, namely, the "other acts" evidence and

7

the ineffective assistance of counsel.  *Id*. at *41.

The State appealed this judgment, and Hutton cross-appealed, alleging that the court of appeals erred in overruling several of his propositions of law.  Hutton again was represented by Attorney Floyd Oliver.  The State advanced the following propositions of law:

I.      Evidence Rule 404(B) generally proscribes the use of other crimes, wrongs or acts independent of the offense for which the defendant is on trial where that evidence is used to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts.  This general rule of exclusion does not apply where the evidence of another crime is relevant to prove the accused's guilt of the crime charged or to connect him with it, and the evidence is not offered merely to show propensity or disposition on the part of the accused to commit the crime.

II.     A request for a pre-sentence report in a capital case, including a summary of the defendant's prior arrests and convictions, does not per se constitute ineffective assistance of counsel.

III.    Testimony of a character witness regarding collateral matters may be limited as irrelevant.

IV.     A prosecutor does not commit prosecutorial misconduct when he questions a character witness regarding the defendant's specific acts which tend to refute the witness' opinion of the defendant's character even if these specific acts constitute criminal behavior, the conviction for which was overturned on appeal.

V.      A prosecutor does not commit prosecutorial misconduct when he reviews for the jury in the penalty phase of a capital case evidence presented by the defense concerning the defendant's prior criminal record.

VI.     A motion for acquittal pursuant to Criminal Rule 29(A) is properly denied when the State presents sufficient evidence that a jury may reasonably find that each element of the crime has been found beyond a reasonable doubt.

VII.    When a sentence of death is imposed the court of appeals must review the sentence of death at the same time it reviews the other issues in the case.

(App. to Return of Writ, vol. 6, 130-32.)

Hutton asserted the following propositions of law in his cross-appeal:

I.      Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments

8

to the United States Constitution and Article I §§ 2, 9, 10 and 16 of the Ohio
Constitution.

II.     In violation of the Eighth and Fourteenth Amendments to the United States Constitution
        and Article I §§ 9 and 16 of the Ohio Constitution, the Appellant's sentence of death is
        inappropriate and disproportionate to similar cases.

III.    The admission of gruesome photographs is subject to the trial court's discretion.  Where
        the photographs' probative value is outweighed by the prejudicial effect, the introduction
        of such photographs is prejudicial error.

IV.     During the penalty phase, the trial court may not instruct the jury to exclude
        consideration of sympathy.  This instruction is violative of the Eighth and Fourteenth
        Amendments of the United States Constitution.

V.      The sentencing instruction informing the jury their death recommendation is not binding
        on the court while their life verdict is binding, unconstitutionally diminished the jury's
        responsibility for imposition of the death penalty in violation of the Eighth and
        Fourteenth Amendments to the United States Constitution.

VI.     The dismissal of a juror after the deliberation of guilt but prior to the deliberation of
        penalty is violative of the Ohio Rule of Criminal Procedure 24(F), R.C. §
        2929.03(C)(2)(b) and the Eighth and Fourteenth Amendments of the United States
        Constitution.

VII.    Trial counsel's failure to object to the inclusion of prejudicial non-statutory aggravating
        factors and failure to object to prejudicial jury instructions during the penalty phase of
        trial deprived the defendant his right to effective assistance of counsel as guaranteed by
        the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

(App. to Return of Writ, vol. 6, 296-98.)

        The Ohio Supreme Court, in another split decision, reversed the decision of the Court of

Appeals on August 8, 1990, and remanded the case back to the Court of Appeals for an

independent review of the sentence.[2]  *State v. Hutton*, 53 Ohio St. 3d 36, 50, 559 N.E.2d 432,

447-48 (Ohio 1990).  Hutton filed a motion for rehearing on August 20, 1990, which the Ohio

---

        [2]      Chief Justice Moyer wrote the majority opinion, with two judges concurring, one
judge concurring in the syllabus and judgment only, and three judges concurring in part and
dissenting in part.

Supreme Court denied on October 3, 1990.  *State v. Hutton*, 54 Ohio St. 3d 710, 561 N.E.2d 945 (Ohio 1990).  The Eighth District Court of Appeals then affirmed Hutton's death sentence on January 17, 1991.  *State v. Hutton*, 72 Ohio App. 3d 348, 594 N.E.2d 692 (Ohio Ct. App. 1991).

Hutton filed a motion for appointment of counsel to the Ohio Supreme Court with the Court of Appeals on November 2, 1990, which the court denied on January 8, 1991.  (App. to Return of Writ, vol. 7, 2.)  Attorney Oliver filed a motion for reconsideration on Hutton's behalf on January 28, 1991, which the court denied on February 1, 1991.  (*Id*. at 31.)  Attorney Oliver died on August 21, 1991.  *See Hutton*, 100 Ohio St. 3d at 180, 797 N.E.2d at 955.  The Court of Appeals granted a second motion for appointment of counsel to the Ohio Supreme Court on February 12, 1992, and appointed Attorneys David Doughten and Hyman Friedman.  (*Id*. at 32.) Hutton, however, did not file a timely appeal of the Court of Appeals' judgment to the Ohio Supreme Court.

Since no appeal had been filed, no further action occurred until July 17, 1996, when the Ohio Supreme Court granted the State's motion to set an execution date of September 22, 1996, and denied Hutton's motion to continue the stay.  *State v. Hutton*, 76 Ohio St. 3d 1421, 667 N.E.2d 24 (Ohio 1996).  On September 19, 1996, the court stayed the execution pending completion of post-conviction proceedings.  *State v. Hutton*, 76 Ohio St. 3d 1480, 669 N.E.2d 861 (Ohio 1996).

Hutton appealed the Court of Appeals' 1991 decision on remand from the Ohio Supreme Court on August 24, 2000, simultaneously filing a motion for delayed appeal.  (App. to Return of Writ, vol. 10, 4, 7.)  On October 18, 2000, the court granted Hutton's motion for a delayed appeal.  *State v. Hutton*, 90 Ohio St. 3d 1441, 736 N.E.2d 903 (Ohio 2000).  Hutton asserted the

10

following propositions of law:

I.      When appellate counsel fails to raise several meritorious issues on appeal, so that the issues are deemed waived by review courts, then appellate counsel was ineffective in his representation and the defendant's conviction and death sentence must be reversed.

II.     When the death sentence imposed on a defendant is unreliable and inappropriate, the imposition of death violates the defendant's constitutional rights.

III.    When the death sentence is excessive and disproportionate to the sentences imposed in similar cases, and when it is inappropriate, the death sentence must be vacated and a life sentence imposed.

(App. to Return of Writ, vol. 10, 142.)

On April 21, 1997, Hutton filed in the Court of Appeals an application for reopening of his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).  (App. to Return of Writ, vol. 8, 3.)  Hutton was represented by Attorneys James Draper and Robert Ingersoll of the Cuyahoga County Public Defenders Office.  He raised the following claims for relief:

1.      Appellate counsel failed to argue that the jury instructions given in Mr. Hutton's case were infirm, because they defined mitigation factors on which Mr. Hutton had not presented any evidence.

2.      Appellate counsel was ineffective for failing to raise the issue that the trial court did not define aggravating factors for the jury.

3.      Appellate counsel was ineffective for not arguing trial counsel was ineffective for failing to make proper objections and preserve issues for appellate review.

4.      Appellate counsel was ineffective for failing to raise issues before the Ohio Supreme Court on cross-appeal.

(App. to Return of Writ, vol. 8, 3-18.)  The Court denied the application on March 20, 2000.

*State v. Hutton*, No. 51704, 2000 WL 301097 (Ohio Ct. App. Mar. 20, 2000).

Hutton appealed the Court of Appeals' ruling to the Ohio Supreme Court, alleging the following proposition of law:

11

> When appellate counsel fails to raise several meritorious issues on appeal, so that the
> issues are deemed waived by review courts, then appellate counsel was ineffective in his
> representation of the defendant and an application to reopen the appeal for ineffective
> assistance of appellate counsel must be granted.

(App. to Return of Writ, vol. 9, 13.)

The State filed a motion with the Ohio Supreme Court to consolidate Hutton's appeals

from the 1991 judgment of the Court of Appeals on remand and the judgment of the Court of

Appeals on his application for reopening of his direct appeal, which the Court granted on July

25, 2001.  (*Id.* at 197.)  The Ohio Supreme Court affirmed both judgments on November 5,

2003.  *State v. Hutton*, 100 Ohio St. 3d 176, 797 N.E.2d 948 (Ohio 2003).

Hutton filed his first post-conviction petition on September 11, 1996, asserting the

following grounds for relief:

1.  The failure of defense counsel to adequately represent the petitioner at the trial or guilt-
    innocence determination stage resulted in a sentence of death that does not comply with
    the minimum constitutional standards of reliability required for the imposition of a death
    sentence under the Eighth and Fourteenth Amendments to the United States Constitution
    and Article I § 9 of the Ohio Constitution.  The petitioner was denied the effective
    assistance of counsel in the trial or guilt-innocence determination phase as guaranteed by
    the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and
    Article I §§ 10 and 16 of the Ohio Constitution.

2.  The State of Ohio failed to provide exculpatory evidence as required by the due process
    clause of both the United States and Ohio Constitutions.

3.  The trial court erred by allowing into evidence other acts testimony that was not
    inextricably connected to the offense.  This evidence was unfairly prejudicial as the State
    did not establish substantial proof that the petitioner raped Eileen Sweeney.  Although
    this issue was raised on direct appeal, the fact that the petitioner was subsequently found
    not guilty of the rape charge was not part of the direct appeal record.

4.  The judgment and sentence against petitioner are void or voidable because he did not
    receive the effective assistance of counsel during the penalty phase of his trial.  Counsel
    fell far below a minimum standard of reasonable legal representation by numerous
    actions and failure to act in violation of his constitutional rights as guaranteed by the
    Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and

12

Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

(App. to Return of Writ, vol. 11, 11.)

Hutton filed an additional petition to vacate on October 22, 1996, asserting the following claims for relief:

1.     The failure of defense counsel to adequately represent the petitioner at the trial or guilt-innocence determination stage resulted in a sentence of death that does not comply with the minimum constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments to the United States Constitution and Article I § 9 of the Ohio Constitution.  The petitioner was denied the effective assistance of counsel in the trial or guilt-innocence determination phase as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I §§ 10 and 16 of the Ohio Constitution.

2.     The State of Ohio failed to provide exculpatory evidence as required by the due process clause of both the United States and Ohio Constitutions.

3.     The trial court erred by allowing into evidence other acts testimony that was not inextricably connected to the offense.  This evidence was unfairly prejudicial as the State did not establish substantial proof that the petitioner raped Eileen Sweeney.  Although this issue was raised on direct appeal, the fact that the petitioner was subsequently found not guilty of the rape charge was not part of the direct appeal record.

4.     The judgment and sentence against petitioner are void or voidable because he did not receive the effective assistance of counsel during the penalty phase of his trial.  Counsel fell far below a minimum standard of reasonable legal representation by numerous actions and failure to act in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

5.     Appellate review plays an essential role in eliminating the systemic arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman v Georgia*, 408 U.S. 238 (1972).  The teaching of *Furman* was that a state may not leave the decision of whether a defendant lives or dies to the unfettered discretion of the jury because such a scheme inevitably results in death sentences that are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by lightening is cruel and unusual."  *Id*. at 309-10.  (Stewart, J., concurring).  Therefore, some form of meaningful appellate review is required to assess the sentencer's imposition of the death penalty.

6.     Petitioner Hutton's convictions and/or sentence are void or voidable because the State of

13

Ohio on appeal failed to prove beyond a reasonable doubt that any constitutional error which occurred during Petitioner's trial did not contribute to the conviction and sentence of the Petitioner.

(App. to Return of Writ, vol. 11, 49-74.)  Hutton filed an amended petition for post-conviction relief setting forth these same claims for relief on October 24, 1996.  (*Id*. at 121-45.)  The trial court dismissed the petition on July 1, 1997.  (*Id*. at 211.)  The court issued its Findings of Fact and Conclusions of Law on April 6, 1999.  (*Id*. at 213-21.)

Hutton appealed the trial court's ruling on his amended post-conviction petition on April 27, 1999, raising the following assignments of error:

1.   The trial court erred to the substantial prejudice of the petitioner by summarily dismissing his post-conviction petition without affording him an evidentiary hearing or allowing discovery.

2.   The Appellant was denied effective assistance of counsel in the guilt-innocence determination phase of trial.

3.   The failure of the State to provide exculpatory evidence deprived the Appellant of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4.   The trial court erred by allowing into evidence other acts testimony that was not inextricably connected to the offense.

5.   Ineffective assistance of counsel at the penalty phase of trial deprived the Appellant of his rights established under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

6.   The trial court erred by failing to grant the Appellant's motions for discovery, an investigator and expert assistance.

7.   Ohio's post-conviction system does not comply with the requirements of due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

8.   The Appellant's convictions and/or sentences are void or voidable because the State of Ohio on direct appeal failed to prove beyond a reasonable doubt that any constitutional error which occurred during Appellant's trial did not contribute to the conviction and

14

sentence of the Appellant.

9.  The Appellant's sentence is void or voidable under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  The Appellant's sentence of death is inappropriate and disproportionate to other defendants throughout the State of Ohio similarly charged.  Ohio courts do not engage in an effective proportionality review as is required by statute.

(App. to Return of Writ, vol. 12, 21-73.)  The Eighth District Court of Appeals affirmed the

decision of the trial court on July 15, 2004.  *State v. Hutton,* No. 76348, 2004 WL 1575248

(Ohio Ct. App. July 15, 2004).

Hutton timely appealed the Court of Appeals' decision to the Ohio Supreme Court,

advancing the following propositions of law:

1.  Where the affidavits provided in Petitioner's Motion to Vacate pursuant to R.C. § 2953.21 establish a meritorious issue, the trial court may not dismiss the petition without an evidentiary hearing.

2.  The failure to properly conduct *voir dire* and to properly investigate a defendant's case constitutes ineffective assistance of counsel where it can be shown that a proper investigation would reasonably have resulted in the defendant's acquittal.

3.  The failure of the State to provide exculpatory evidence deprives a defendant of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4.  Testimony alleging an unproven rape allegation may not constitute harmless error, particularly where a defendant is subsequently acquitted of that allegation.

5.  Defense counsel's failure to investigate or make any preparation into the penalty phase of a capital trial constitutes the constructive denial of counsel.

6.  The trial court must grant reasonable requests for discovery and experts made pursuant to R.C. § 2953.21 where such discovery could reasonably lead to proof of petitioner's actual innocence.

7.  A reviewing court may not invoke a harmless error standard where the error is of such a nature that the integrity of the trial is placed into question.

8.  The petitioner's sentence is void or voidable under the Fifth, Sixth, Eighth and

15

Fourteenth Amendments to the United States Constitution.  The petitioner's sentence of death is inappropriate and disproportionate to other defendants throughout the State of Ohio similarly charged.  Ohio courts do not engage in an effective proportionality review as is required by statute.

(App. to Return of Writ, vol. 13, 5-22.)  The Ohio Supreme Court declined jurisdiction to hear the appeal on December 15, 2004.  *State v. Hutton*, 104 Ohio St. 3d 1426, 819 N.E.2d 709 (Ohio 2004).

Hutton filed a second post-conviction petition on February 2, 2001, raising the following claims for relief:

1.     The failure of defense counsel to adequately represent the petitioner at the trial or guilt-innocence determination stage resulted in a sentence of death that does not comply with the minimum constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments to the United States Constitution and Article I § 9 of the Ohio Constitution.  The petitioner was denied the effective assistance of counsel in the trial or guilt-innocence determination phase as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I §§ 10 and 16 of the Ohio Constitution.  *Strickland v. Washington*, 466 U.S. 668 (1984).  The result of the proceeding was fundamentally unfair or unreliable.

2.     Mr. Hutton's convictions and/or sentences are void or voidable because he is factually and actually innocent of the offense of aggravated murder for which he was convicted and sentenced to death.

3.     The State failed to provide exculpatory evidence to the petitioner at the time of trial.  Cleveland homicide detectives had spoken to Bruce Laster and were aware that he was with the petitioner on the night of the offense and did not have any knowledge of the petitioner's involvement.  In fact, the testimony of Mr. Laster would have directly impeached the testimony of Samuel Simmons Jr.  The testimony would have absolved the petitioner of the homicide.  The content of Mr. Laster's statement to the homicide detectives was not supplied to the petitioner.

4.     The State failed to provide exculpatory evidence to the petitioner at the time of trial.  Cleveland homicide detectives had spoken to Bruce Laster and were aware that he was with the petitioner on the night of the offense and did not have any knowledge of the petitioner's involvement.  As this failure was not due to simple neglect and appears to have been willful, a lesser standard is required for a reversal.  *Napue v. Illinois*, 360 U.S. 264 (1959).

16

5.    The judgment and sentence against Petitioner Hutton are void or voidable because he did not receive the effective assistance of counsel during the penalty phase of his trial. Counsel fell far below a minimum standard of reasonable legal representation by numerous actions and failures to act in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I §§ 2, 9, 10 and 16 of the Ohio Constitution.

(App. to Return of Writ, vol. 17, 11-28.)  The trial court dismissed Hutton's petition on January 3, 2002.  (*Id*. at 259-70.)

Hutton appealed the trial court's dismissal of his second post-conviction petition to the Eighth District Court of Appeals on January 16, 2002.  (App. to Return of Writ, vol. 18, 2.)  He filed a motion to stay and hold in abeyance the appellate proceedings on February 27, 2002.  (*Id*. at 25.)  The court granted the motion to stay on March 25, 2002.  (*Id*. at 32.)  The Eighth District Court of Appeals affirmed the trial court's decision on October 11, 2007.  *State v. Hutton*, No. 80763, 2007 WL 2955663 (Ohio App. Oct. 11, 2007).

Attorney Doughten represented Hutton on all of his post-conviction proceedings.

Hutton, again represented by Attorney Doughten, also filed a motion for leave to file a motion for a new trial on February 2, 2001.  (*Id*. at 62-109.)  Hutton based his request for a new trial upon a recently obtained statement of Bruce Laster, Hutton's co-defendant, which he argued contains exculpatory information that the prosecution suppressed from him at trial in violation of his constitutional rights.  (*Id*.)  The State filed a motion to dismiss the motion on March 27, 2001.  (*Id*. at 113-40.)  The motion remains pending.[3]

**B.      Habeas Proceeding**

---

[3]      Hutton also vigorously opposed the judgment against him for court costs.  (*See* ECF No. 64, 31-33.)  The Court will not recite the procedural history of that litigation, however, as it presented no issues that are relevant to Hutton's habeas claims.

17

Hutton filed a Notice of Intention to File a Habeas Corpus Petition on October 11, 2005. (ECF No. 1).  Concurrently, he filed a Motion for the Appointment of Counsel and a Motion to Proceed In Forma Pauperis.  (ECF No. 3.)  The Court granted both motions and appointed David Doughten and John Gibbons to represent Hutton.  (ECF No. 4.)

On December 15, 2005, Hutton filed the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  (ECF No. 10.)  Respondent filed a Return of Writ on February 13, 2006.  (ECF No. 15.)  Respondent filed an Amended Answer of Return of Writ on March 13, 2006.  (ECF No. 17.)  After requesting and receiving two extensions of time, Hutton filed a Traverse on April 11, 2006.  (ECF No. 20.)  Respondent filed a Response to the Traverse on April 26, 2006.  (ECF No. 21.)

Hutton filed a motion for discovery on May 5, 2006.  (ECF No. 23.)  Respondent opposed that motion on May 18, 2006.  (ECF No. 25.)  Because Hutton simultaneously was seeking relief in state court on the very issues he wished to obtain discovery here, the Court denied the motion without prejudice on December 29, 2006.  (ECF No. 27.)  On October 11, 2007, the Court issued an order stating that Hutton would have sixty days after the conclusion of his state-court litigation in which to file a renewed motion for discovery and/or motion for investigator.  (ECF No. 33.)

After completing his state-court litigation, Hutton re-filed a motion for discovery on May 19, 2008.  (ECF No. 36.)  Respondent opposed the motion.  (ECF No. 37.)  As part of her opposition to the motion, Respondent argued, as she did in the Return of Writ, that the Petition was filed untimely and should therefore be dismissed.  (*Id.*)  Therefore, prior to deciding the pending discovery motion, the Court ruled that while it was a close question whether Hutton

18

filed the Petition within the statute-of-limitations period set forth in 28 U.S.C. § 2244(d), he was in any event entitled to equitable tolling of the statute, and his habeas case would continue. (ECF No. 38.)  In a separate order, the Court granted Hutton's second discovery motion in part and denied it in part.  (ECF No. 39.)  Specifically, it permitted Hutton to obtain records from the Bureau of Criminal Investigations and reports pertaining to his trial, and also permitted him to depose his trial counsel.  (*Id.*)

Hutton filed a third motion for leave to file additional discovery on April 11, 2009. (ECF No. 43.)  Respondent opposed the motion.  (ECF No. 44.)  Again, the Court granted Hutton's discovery motion in part and denied it in part.  (ECF No. 46.)  Specifically, the Court allowed Hutton to obtain records and reports from the Cleveland Police Department and St. Luke's Hospital.  (*Id.*)

On November 3, 2010, Hutton filed a motion to expand the record.  (ECF No. 49.) Respondent opposed the motion.  (ECF No. 51.)  The Court granted the motion on December 28, 2010.  (ECF No. 52.)

Hutton then filed a motion to amend his petition on January 31, 2011.  (ECF No. 54.) Respondent opposed the motion on February 9, 2011.  (ECF No. 55.)  Hutton filed a reply brief on February 22, 2011.  (ECF No. 56.)  The Court granted Hutton's motion on May 17, 2011. (ECF No. 58.)  Hutton filed the Amended Petition on June 20, 2011.  (ECF No. 60.)

After requesting and receiving two extensions of time, Respondent filed a Response to Amended Petition.  (ECF No. 64.)  Hutton requested and received one extension of time, and filed an Amended Traverse on October 18, 2011, rendering the matter ripe for disposition.  (ECF No. 66.)

### III.    Petitioner's Grounds for Relief

Hutton asserts thirteen grounds for relief.  The grounds are as follows:

1.    The failure of defense counsel to adequately represent the petitioner at the culpability phase or guilt-innocence determination phase of trial resulted in a sentence of death that does not comply with the minimum constitutional standards of reliability.

2.    The failure to provide favorable or exculpatory evidence to Hutton before trial was violative of Petitioner Hutton's federal rights.

3.    The sentence against Petitioner Hutton is void or voidable because he did not receive the effective assistance of counsel during the penalty phase of trial.

4.    The evidence is insufficient to sustain the convictions of aggravated murder and kidnapping.

5.    The prosecutor's misconduct during the culpability phase of trial denied Petitioner Hutton a fair trial.

6.    The trial court erred by allowing into evidence unfairly prejudicial testimony of a rape allegation that did not occur.  The Ohio Supreme Court found this to be error, but used an improper standard to determine the error to be harmless.

7.    The prosecutor's misconduct during penalty phase closing argument deprived Hutton of a sentencing hearing in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

8.    The trial court failed to define the term "aggravating factor" for the jury prior to its deliberations in the penalty phase.  Thus, the jury had no guidance in determining the factors to be considered when deciding the appropriateness of the death penalty in this case.

9.    The trial court improperly instructed the jury during the penalty phase of trial not to consider any sympathy in its determination of the appropriateness of the death penalty.

10.    The trial court improperly dismissed a juror from the penalty phase deliberations and allowed an alternate juror, who had not deliberated in the culpability determination phase, to deliberate as to the appropriate penalty.  The trial court also erroneously instructed the alternate juror to adopt the findings of the remaining jurors, thus depriving Hutton his right to have all jurors make their own individual finding of the appropriateness of the death penalty.

11.    Petitioner Hutton was denied effective assistance of appellate counsel.

20

12.     The Ohio courts have not performed any meaningful proportionality review as is required by Ohio's statutory death penalty scheme.

13.     The cumulative error in Petitioner Hutton's case denied him a fair trial and penalty phase hearing.

(ECF No. 66, *passim.*)

## IV.     Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) ("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Hutton's petition was filed on December 15, 2005, AEDPA governs this Court's consideration of his petition.

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford*, 538 U.S. at 206 (quoting *(Michael) Williams v. Taylor*, 529 U.S. 362, 436 (2000)).  The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings."  *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

21

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.  Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original).

With respect to § 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to *dicta*, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).  The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are independent tests and must be analyzed separately.  *Williams*, 529 U.S. at 412-13; *Hill v. Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003).  A state-court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case."  *Id.* at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Id.* at 407; *Hill*, 337 F.3d at 711.

22

As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

The Supreme Court interpreted the "unreasonable determination of the facts" clause in § 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003). In that case, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29. In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary. This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court, which can only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) ("regardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state-court must be upheld unless there is clear and convincing evidence to the contrary"). This presumption only applies to basic, primary facts, and not to mixed questions of law and fact. *See Mason*, 325 F.3d at 737-38 (holding ineffective assistance of counsel is mixed

23

question of law and fact to which the unreasonable application prong of § 2254(d)(1) applies).

By its express terms, however, § 2254(d)'s constrained standard of review applies only to claims that were adjudicated on the merits in the state-court proceeding. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011)*; Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under AEDPA does not apply.  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, but rather conducts a de novo review of the claim.  *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007) (citations omitted); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state-court result is contrary to or unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

Further, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard.  In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," then relief is precluded under AEDPA.  *Id*. at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under de novo review," and that "even a strong case for relief does not mean the state court's contrary

24

conclusion was unreasonable." *Id*. at 785.  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted).  Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.  This is a very high standard, which the Court readily acknowledges:  "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 786.

## V.      Exhaustion and Procedural Default

### A.      Exhaustion

AEDPA's standard of review applies only to claims that have been properly exhausted before the state courts.  Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that – the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1); *see also Rose v. Lundy*, 455 U.S. 509 (1982).

Thus, exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the

claim.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).[4]  Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell*, 274 F.3d at 349.  To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

### B.    Procedural Default

#### 1.    General Law

Even where a state prisoner exhausts available state-court remedies, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*,

---

[4]  The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

26

501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts'

application of it "must rely in no part on federal law."  *Fautenberry v. Mitchell*, No. C-1-00-332,

2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501 U.S. at 732-33).  To

be adequate, a state procedural rule must be "'firmly established and regularly followed'" by the

state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 130 S. Ct 612, 618 (2009).

If a petitioner fails to fairly present any federal habeas claims to the state courts but has no

remaining state remedies, then the petitioner has procedurally defaulted those claims.

*O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

　　In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now

familiar test to be followed when the state argues that a habeas claim is defaulted because of a

prisoner's failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule
> that is applicable to the petitioner's claim and whether the petitioner failed to
> comply with that rule.  Second, the federal court must determine whether the state
> courts actually enforced the state procedural sanction -- that is, whether the state
> courts actually based their decisions on the procedural rule.  Third, the federal
> court must decide whether the state procedural rule is an adequate and
> independent state ground on which the state can rely to foreclose federal review
> of a federal constitutional claim. Fourth, if the federal court answers the first
> three questions in the affirmative, it would not review the petitioner's
> procedurally defaulted claim unless the petitioner can show cause for not
> following the procedural rule and that failure to review the claim would result in
> prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further

citations omitted).

　　In determining whether the *Maupin* factors are met, the federal court again looks to the

last explained state-court judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v.*

*Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).  If the last state court rendering a reasoned opinion on

a federal claim "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted and barred from consideration on federal habeas review.[5]  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  Conversely, if the last state court to be presented with a particular federal claim reaches the merits of that claim, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review.  *Ylst*, 501 U.S. at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review.  *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-75.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp. 2d 796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable.  *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes

---

[5]     An exception to this rule lies where "the later state decision rests upon a prohibition against *further* state review," in which case the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ."  *Ylst*, 501 U.S. at 804 n.3.  In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

cause.  *Murray*, 477 U.S. at 488-89; *Rust v. Zent*, 17 F.3d at 161; *Mohn*, 208 F. Supp. 2d at 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  *Murray*, 477 U.S. at 488-89.  If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim.  *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495-96).  When the Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'"  *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

29

The Court will address the issues of exhaustion and procedural default presented in this case when it reviews Hutton's individual claims.

## VI. Analysis of Petitioner's Grounds for Relief

### A. *First and Third Grounds for Relief:  Ineffective Assistance of Trial Counsel*

For his first and third grounds for relief, Hutton claims that his trial counsel violated his Sixth Amendment right to effective assistance of counsel.  Specifically, he complains that counsel:

1. was not qualified to represent a death penalty client;

2. failed to conduct a proper voir dire of prospective jurors;

3. failed to conduct an adequate investigation prior to trial;

4. failed to elicit relevant evidence from witnesses at trial;

5. failed to investigate available mitigation evidence and hire experts;

6. failed to present any mitigation evidence;

7. failed to adequately consult with Hutton about mitigation and to prepare him for his unsworn statement;

8. failed to object to the admission of the pre-sentence investigation report and to the prosecutor reading his arrest record from it;

9. failed to object to the prosecutor referencing statutory mitigating factors that did not apply;

10. failed to object to certain sentencing jury instructions, including the definition of aggravating circumstance, the inclusion of statutory mitigating factors that did not apply, and the use of the term "recommend" in the death penalty instruction;

11. failed to object to the trial court's inclusion of a firearms specification in the indictment, which was submitted to the jury; and

12. failed to argue or request a jury instruction regarding residual doubt.

(ECF No. 60, 7-11, 22-27; and ECF No. 66, 5, 7-10, 24-25, 27-30.)

1. **Procedural Posture**

a. **procedural history of Hutton's ineffective-assistance claims**

Hutton vigorously challenged his trial counsel's performance in the state courts.  On direct appeal to the Eighth District Court of Appeals, he raised numerous grounds of ineffective assistance of counsel.  They were:  failure to file pretrial motions; failure to conduct a proper voir dire examination; failure to move for a mistrial at certain key points during the trial, such as after the introduction of "other acts" evidence, after the admission of prejudicial photographs of the victim, after improper limitations on recross- and redirect examinations, after prosecutorial misconduct, and after a juror was improperly dismissed; failure to move for acquittal regarding the two counts pertaining to Simmons; failure to object to the jury not being sequestered between the guilt and sentencing phases of the trial; failure to present evidence in mitigation; failure to object to the inclusion of firearms specifications; failure to object when the prosecutor read certain portions of his criminal record to the jury; and failure to object to the trial court's use of the word "recommend" in his jury instructions.  (App. to Return of Writ, vol. 3, 60, 62.)

The court of appeals found each of Hutton's ineffective-assistance claims concerning the guilt phase meritless, concluding that "[a]t the guilt phase, counsel conducted the defense in an acceptable manner."  *State v. Hutton*, No. 51704, 1988 WL 39276, at **18-19 (Ohio Ct. App. Apr. 28, 1988).  In a split decision, however, the court found reversible error in counsel's failure to object when the prosecutor read Hutton's criminal record from the pre-sentence investigation report ("PSI") during his closing argument in the penalty phase, or, at a minimum, his failure to have Hutton's criminal record excised from the PSI as to arrests that never resulted in

31

convictions.  *Id*. at **29, 38.

The State appealed the appellate court's decision finding ineffective assistance based on trial counsel's reliance on the PSI in the sentencing phase, and the Ohio Supreme Court reversed the court of appeals' decision on that ground.  *State v. Hutton*, 53 Ohio St. 3d 36, 42-44, 559 N.E.2d 432, 440-42 (Ohio 1990).  Hutton cross-appealed the court of appeals' decisions denying four of his ineffective-assistance claims, challenging trial counsel's failure to:  investigate and present mitigating evidence; object to the trial court's inclusion of a firearms specification in the indictment; object to the prosecutor reading his juvenile criminal record to the jury during his closing argument; and object to the use of the term "recommend" in the sentencing jury instructions.  (App. to Return of Writ, vol. 6, 335-38.)  The court denied each of these claims.  *Hutton*, 53 Ohio St. 3d at 48-49, 559 N.E.2d at 446.

Hutton then raised numerous ineffective-assistance claims in his first post-conviction petition.  He argued that trial counsel:  was not qualified to represent a death penalty client; failed to conduct an adequate voir dire; failed to adequately investigate the case, hire an investigator or move to have an investigator appointed, interview witnesses who testified, and call certain witnesses or elicit certain testimony from witnesses; failed to investigate possible mitigating factors, adequately present and/or prepare mitigation witnesses, hire a psychologist to assist in mitigation, and obtain mitigation records; failed to prepare Hutton for his unsworn testimony and adequately consult with him about mitigation; and failed to object to the admission of the PSI.  (App. to Return of Writ, vol. 11, 124-29, 131-36.)  Hutton submitted thirteen affidavits to support his petition, as well as a journal entry indicating his acquittal of charges related to the alleged rape and kidnapping of Eileen Sweeney, a newspaper article that

32

mentions his assistance in a police homicide investigation, and the appellate-court decision

reversing a prior manslaughter conviction.  (*Id*. at 146-86.)

The trial court first held that the claims were barred by the doctrine of res judicata.

(App. to Return of Writ, vol. 11, 216.)  The court went on, however, to review some of the

ineffective-assistance claims individually, concluding that Hutton received effective assistance

of trial counsel and that Hutton's supporting affidavits were not "quality" evidentiary

documents, but were "specious and totally inadequate to substantiate a substantive ground for

relief."  (*Id*. at 220.)

The Eighth District Court of Appeals affirmed the trial court's ruling on Hutton's

ineffective-assistance claims, specifically citing the basis of its decision as res judicata.  *State v.*

*Hutton,* No. 76348, 2004 WL 1575248, at *1 (Ohio Ct. App. July 15, 2004) ("seven [of Hutton's

assignments of error, including the denial of the ineffective-assistance claim] are barred by res

judicata").  The court did not address the merits of Hutton's ineffective-assistance claims.  But

the court agreed with the trial court that Hutton's supporting affidavits lacked credibility and

held that the trial court properly denied Hutton an evidentiary hearing and discovery on the

ground that Hutton failed to "set forth sufficient operative facts to establish substantive grounds

for relief" as required under Ohio law.  *Id*. at *2.  The Ohio Supreme Court declined jurisdiction

on appeal.  *State v. Hutton*, 104 Ohio St. 3d 1426, 819 N.E.2d 709 (Ohio 2004).

Hutton filed a second post-conviction petition, raising ineffective-assistance claims

based on counsel's failure to call Bruce Laster as a witness in both the guilt and penalty phases

of trial.  (App. to Return of Writ, vol. 17, 11-21, 25-27.)  The trial court dismissed the petition

on its merits.  (*Id*. at 259-70.)  The Eighth District Court of Appeals affirmed the judgment, but

33

on procedural grounds, finding the petition untimely.  *Hutton*, 2007 WL 2955663, at *3.

Hutton's ineffective-assistance claims in his habeas petition are nearly identical to those he asserted in his first post-conviction petition.  He has added, however, three sub-claims that he argued on direct appeal but not on post-conviction:  counsel's failure to object to the prosecutor's reference to his criminal record; counsel's failure to object to the trial court's use of the term "recommend" in the death penalty jury instructions; and counsel's failure to object to the trial court's inclusion of a firearms specification in the indictment.  He also asserts claims that it appears from the record he did not raise in any state court, complaining about his attorney's failure to:  object to the trial court's failure to define aggravating circumstance; object to the prosecutor and trial judge instructing the jury as to statutory mitigating factors that did not apply; and request an instruction on residual doubt.  (ECF No. 60, 7-12, 21-27.)

### b.    *res judicata*

Respondent argues that each of Hutton's ineffective-assistance sub-claims is procedurally defaulted.  She contends that two of the sub-claims–those relating to voir dire and counsel's capital trial experience–are "abandoned and procedurally defaulted" because Hutton did not raise them on direct appeal to the Ohio Supreme Court.  (ECF No. 64, 45, 47.)  The others are barred, she asserts, because Hutton raised them in his first post-conviction petition and the court denied them on the ground of res judicata.  (*Id*. at 44-45, 49, 51, 52, 53, 55, 57, 58, 64.)  Hutton concedes that the issues he raised on direct appeal to the court of appeals but not to the Ohio Supreme Court concerning ineffective assistance during the guilt phase of trial "have

34

not been exhausted and may ultimately have been defaulted."[6]  (ECF No. 66, 4.)  But he counters that the post-conviction court misapplied the res judicata rule to the ineffective-assistance claims he raised on post-conviction, and it therefore does not bar them from habeas review.[7]  (*Id*. at 4, 21-24.)

As a preliminary matter, this Court concludes that the ineffective-assistance sub-claims Hutton raised to the Ohio Supreme Court are preserved for habeas review *even where* he also raised them on post-conviction and the state court declined to address them on the ground of res judicata.  Those sub-claims are:  counsel's failure to investigate and present mitigation evidence and counsel's failure to object to the admission of the PSI.  Ohio's res judicata rule normally bars a defendant from raising for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or on direct appeal.  *State v. Perry*, 10 Ohio St.

---

[6]     Respondent does not argue that any of Hutton's ineffective-assistance claims are unexhausted.  Although the State's failure to raise exhaustion does not invariably waive the defense, *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987), and this Court has the authority to raise the issue sua sponte, *see, e.g., Brown v. Fauver*, 819 F.2d 395, 398 (3rd Cir. 1987), the Court will not engage in a sua sponte analysis of exhaustion where the respondent has failed to raise it.  Moreover, AEDPA's § 2254(b)(2) permits courts to deny unexhausted habeas claims on the merits where appropriate.  *See* 28 U.S.C. § 2254(b)(2); *Hanna v. Ishee,* 694 F.3d 596, 610 (6th Cir. 2012) (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the claim).

[7]     Hutton does not argue that any procedural default of these claims can be excused by a demonstration of cause and prejudice, so the Court will not address that issue either.  *See, e.g., Acosta v. Artuz*, 221 F.3d 117, 122 (2nd Cir. 2000) ("Generally, courts should not raise *sua sponte* nonjurisdictional defenses not raised by the parties.") (citing *Hardiman v. Reynolds,* 971 F.2d 500, 502 (10th Cir. 1992) (quoting *United States v. Burke*, 504 U.S. 229 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one.")));  *Wogenstahl v. Mitchell,* 668 F.3d 307, 342 (6th Cir. 2012) ("Wogenstahl does not argue cause to excuse his default.  Thus, we conclude that this claim was procedurally defaulted.").

2d 175, 180, 226 N.E.2d 104, 108-09 (Ohio 1967).  However, "[w]hen a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."  *Cone v. Bell*, 556 U.S. 449, 466 (2009).  *See also Ylst,* 501 U.S. at 804 n.3 (when a "state decision rests upon a prohibition against *further* state review," the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil").  In those cases, habeas courts "look through" the later decision to the prior reasoned state-court judgment.  *Id*. at 805.

This Court must next determine whether the ineffective-assistance claims that the post-conviction court found barred based on res judicata, because they were *not* raised on direct appeal to the Ohio Supreme Court *when they could have been*, are procedurally defaulted. Those claims are:  counsel's inexperience, counsel's improper voir dire, counsel's failure to investigate and present evidence during the guilt phase of trial, and counsel's failure to consult with Hutton during mitigation.

Hutton first claims that the Eighth District Court of Appeals did not "clearly state" its basis for applying res judicata*,* effectively reversing the trial court's finding of procedural default and leaving its merits review intact.  (*Id*. at 21.)  This argument fails.  The Court of Appeals explicitly held that Hutton's post-conviction ineffective-assistance claims were "barred by res judicata" and, therefore, affirmed the trial court's finding of procedural default.  *See Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003) (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case 'clearly and expressly states that its judgment rests on a state procedural bar.'")).

36

Hutton's second argument deserves closer examination.  He contends that the state court improperly applied res judicata to these ineffective-assistance claims because they were supported by evidence dehors the record.  (ECF No. 66, 4.)

Ohio courts routinely apply the res judicata rule to claims raised in petitions seeking post-conviction relief, since the doctrine prevents post-conviction relief on "any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at trial*, which resulted in that judgment or conviction, *or on an appeal* from that judgment."  *State v. Cole*, 2 Ohio St. 3d 112, 113, 443 N.E.2d 169, 171 (1982) (emphasis original).  There is an exception to Ohio's res judicata doctrine, however, when a petitioner presents evidence dehors, or outside, the record to support a claim on post-conviction.  *See, e.g., State v. Smith*, 17 Ohio St. 3d 98, 101, 477 N.E.2d 1128, 1131-32 n.1 (Ohio 1985); *Perry*, 10 Ohio St. 2d at 179, 226 N.E.2d at 107 (if the defendant "had no means of asserting the constitutional claim there asserted until his discovery, after the judgment of conviction, of the factual basis for asserting that claim," then the claim "was not one that could have been raised . . . before the judgment of conviction, and hence could not reasonably be said to have been . . . waived").

The Ohio Supreme Court has cautioned, however, that evidence dehors the record will not overcome the res judicata bar in cases where "the allegations outside the record upon which [a petitioner] relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence and, thus, to justify the trial court's application of the principles of *res judicata*."  *Cole*, 2 Ohio St. 3d at 114, 443 N.E.2d at 171.  Accordingly, Ohio courts have limited this "new evidence" exception to evidence that "demonstrate[s] that the petitioner could not have appealed the constitutional

37

claim based upon information in the original record."  *State v. Lawson*, 103 Ohio App. 3d 307,

315, 659 N.E.2d 362, 367 (Ohio Ct. App. 1995).  It must be "competent, relevant and material,"

and meet a "threshold standard of cogency; otherwise it would be too easy to defeat the holding

of *Perry* by simply attaching as exhibits evidence which is only marginally significant and does

not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery."[8]

*Id*. (internal quotation marks and citation omitted).

      In line with the "new evidence" exception, the Ohio Supreme Court has held that

"[g]enerally, the introduction in a [post-conviction relief] petition of evidence *dehors* the record

of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid

dismissal on the basis of *res judicata*."  *Cole*, 2 Ohio St. 3d at 114, 443 N.E.2d at 171.

Conversely, res judicata is a proper ground for dismissing ineffective-assistance claims raised in

post-conviction proceedings when the defendant is represented by new counsel upon direct

review, fails to raise the claim on direct review, and such issue "could fairly have been

determined without resort to evidence *dehors* the record."  *Cole*, 2 Ohio St. 3d at 113, 443

N.E.2d at 171.

      The Sixth Circuit repeatedly has held that the res judicata doctrine is an adequate and

independent state ground to procedurally bar claims asserted in federal habeas actions.  *See, e.g.,*

*Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th

Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000).  The court also has held,

---

      [8]      For example, Ohio courts have found the following evidence dehors the record to overcome the res judicata bar:  evidence withheld by the state; an affidavit by a witness sworn to after the trial in which the witness states that his testimony at trial was false; and a DNA finding in cases that were heard before the use of DNA evidence.  *State v. Jones*, No. 2001-A-0072, 2002 WL 31812945, at *3 n.2 (Ohio Ct. App. Dec. 13, 2002).

however, that "an incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground." *See Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (citing *Durr*, 487 F.3d at 434-35, and *Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007) (noting that the court has "declined to observe Ohio's procedural bar and instead [has] proceeded to the merits of an ineffective-assistance claim when we have concluded that Ohio improperly invoked its res judicata rule")).

Hutton points to the Sixth Circuit case *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), for the proposition that "when a habeas petitioner raises a claim in state post-conviction based on evidence outside the record, that claim is *not* procedurally defaulted even if the state post-conviction court finds to the contrary."  (ECF No. 66, 21-22.)  Indeed, the court held in *Hill* that "ineffective-assistance claims [raised in post-conviction] are not barred by res judicata under Ohio law when evidence outside the direct-appeal record is presented . . . ."  *Hill*, 400 F.3d at 314.  Since *Hill*, the Sixth Circuit has held in several cases that a petitioner's ineffective-assistance claim was not procedurally defaulted because Ohio's res judicata bar was misapplied to the claim.  *See, e.g., Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) (finding petitioner's ineffective-assistance claim "relies on evidence outside of the trial record and therefore was not defaulted when he failed to raise it on direct appeal"); *Richey*, 498 F.3d at 359-60; *White v. Mitchell*, 431 F.3d 517, 526-27 (6th Cir. 2005); *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001) (all holding same).

Hutton, however, oversimplifies and misrepresents *Hill*'s holding.  In the cases in which the Sixth Circuit has followed *Hill*, the court has made it clear that *Hill* does not circumvent Ohio's res judicata doctrine by permitting habeas courts to reach the merits of any claim

dismissed on res judicata grounds just because a petitioner presents some supporting evidence outside the record.  Rather, the court disregarded the procedural bar only where the evidence at issue was competent, relevant and material, as the doctrine requires.  For example, the evidence at issue in *Hill* was an affidavit from an addiction specialist, who testified during the petitioner's mitigation phase that he had been contacted after the guilt phase of the trial, did not meet the petitioner until the morning he testified, and that, had he evaluated the petitioner earlier, he could have testified specifically about the petitioner and his addiction as opposed to addiction in general.  *Hill,* 400 F.3d at 314.  In *Greer*, the evidence at issue concerned witnesses who never appeared at trial, as well as the testimony of trial counsel respecting trial strategy, which the court stated was "by definition *dehors* the record."  *Greer*, 264 F.3d at 675.  In *Richey*, the court observed,

> [T]he only way that Richey could make out a violation of his constitutional rights was to adduce evidence establishing what his counsel would have learned about the State's arson evidence, had his counsel performed effectively.  This necessarily required evidence outside the record, and it is exactly the kind of evidence that Richey submitted with his state post-conviction petition, and further developed through discovery in the district court. . . .  None of this testimony was available to Richey on direct appeal precisely because, under Ohio law, direct appeals are confined to the trial record.  Had Richey asserted his ineffective-assistance-of-counsel claim on direct appeal, then, he would have lost.  Without evidence showing what kind of scientific defense a reasonably competent attorney would have mounted, the state court would have had no basis for concluding that Richey's counsel was deficient and that Richey was prejudiced thereby.

*Richey*, 498 F.3d at 360.  *See also White*, 431 F.3d at 527 (noting the similarity of claims and "quality of evidence presented" in that case and in *Hill*, where petitioner submitted affidavits of mitigation experts and two additional experts).  *Hill*, therefore, did not create an exception allowing habeas petitioners to bypass Ohio's res judicata doctrine; it merely made explicit that

habeas courts will not automatically enforce this procedural bar, but will review the ruling to ensure that it complies with Ohio law.

The Court has thoroughly examined the additional evidence Hutton submitted with his post-conviction petition in support of his ineffective-assistance claims.  For the reasons explained more fully below, the Court finds that it would not have materially changed the case that could have been presented on direct appeal.  The Ohio court, therefore, properly applied res judicata to the ineffective-assistance claims Hutton raised in his post-conviction petition that could have been raised on direct appeal but were not, and they are procedurally defaulted.  *See Wogenstahl*, 668 F.3d at 342 ("Given the restrictions on the evidence *dehors* the record exception to Ohio's res judicata rule and given that Wogenstahl's [ineffective-assistance] claim regarding mitigation evidence at the state level relied nearly exclusively on evidence from the trial itself, we cannot conclude that the Ohio Court of Appeals improperly applied its *res judicata* rule to this claim.").

### c.   Hutton's remaining sub-claims

The remaining ineffective-assistance sub-claims that Hutton never raised in state court at all are procedurally defaulted.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999) (holding that a claim procedurally defaulted where the petitioner did not appeal the claim to the state supreme court); *Buell*, 274 F.3d at 349 (where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim).  They are:  failure to object to the trial court's failure to define aggravating circumstance; failure to object to the prosecutor commenting upon, and the trial court instructing the jury as to, statutory mitigating factors that did not apply; and failure to

41

request an instruction on residual doubt.  Conversely, the remaining sub-claims that Hutton did raise on direct appeal to the Ohio Supreme Court (but not on post-conviction) are preserved for habeas review.  They are:  counsel's failure to object to the prosecutor's reference to his criminal record; counsel's failure to object to the trial court's use of the term "recommend" in the death penalty jury instructions; and counsel's failure to object to the trial court's inclusion of a firearms specification in the indictment.

### 2.        Merits

Even if all of Hutton's claims of ineffective assistance of counsel were ripe for review, they lack merit.  To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness."  *Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors.  To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id*. at 693 (citation omitted).  Counsel's  errors must be "so serious as to deprive

the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697). The Supreme Court recently explained, "Surmounting *Strickland*'s high bar is never an easy task. . . . An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter,* 131 S. Ct. 770, 788 (2011) (citations and internal quotation marks omitted).

Thus, as the Supreme Court often has repeated, "[j]udicial scrutiny of a counsel's performance must be highly deferential'" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 689. The Court recently emphasized, "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Under AEDPA, a habeas court is limited to determining whether a state-court decision regarding an ineffective-assistance claim was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of § 2254(d)(1) applies). The Supreme Court

recently observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so."  *Harrington*, 131 S. Ct. at 788.  Therefore, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id*.

The trial court on post-conviction was the last state court to provide a reasoned decision on most of Hutton's ineffective-assistance claims.  Although the court gave alternative grounds for its ruling, first applying res judicata to the claims and then proceeding to the merits, the claims were "adjudicated on the merits" and therefore must be afforded AEDPA deference under § 2254(d).  The Sixth Circuit has held that "as long as the state court put forward a merits-based ground for denying post-conviction relief, its mentioning of procedural default as an alternative or even primary ground for denying relief does not preclude AEDPA deference." *McClellan v. Rapelje*, 703 F.3d 344, 354 (6th Cir. 2013) (dissent) (citing *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010), and *Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008) (confirming this rule and noting that "[a]ll of the circuit courts that have considered th[is] question" have held the same)).  In addition, AEDPA deference applies regardless of whether the state court provided little or no reasoning at all for its decision.  *Harrington,* 131 S. Ct. at 784.  Indeed, a state court need not cite or even be aware of Supreme Court cases under § 2254(d).  *Id*.  The Court in *Harrington* explained,

> Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.

*Id*.

In light of this standard, the Court now reviews Hutton's individual grounds for relief.

### a. counsel's inexperience

For Hutton's first ineffective-assistance sub-claim, he argues that his trial counsel was not qualified to represent a capital defendant because he had never done so in the past.  (ECF No. 60, 7.)  The trial court on post-conviction rejected this claim, finding Hutton's counsel's inexperience in capital work "irrelevant in light of the fact that counsel zealously represented his client and gave him more than satisfactory assistance."  (App. to Return of Writ, vol. 11, 219.)

In *United States v. Cronic*, 466 U.S. 648, 665 (1984), the Supreme Court held, "The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation."  The Court found that the fact that the defendant's attorney in this complex mail fraud case was young, his principal practice was in real estate, and this was his first jury trial, did not provide a basis for finding ineffective assistance of counsel without a showing of actual ineffectiveness.  *Id.*  Here, Hutton has offered no evidence to prove either his attorney's lack of experience or how that inexperience impacted his trial.  Thus, the state court's conclusion that Hutton's counsel's inexperience was not a ground for relief neither contradicts nor unreasonably applies *Strickland*.

### b. guilt phase

### i. deficient voir dire

Hutton argues for this sub-claim that his trial counsel conducted a deficient *voir dire*.  He complains that his counsel did not ask the "majority" of prospective jurors a single question about their views on the death penalty; did not object to the State using peremptory challenges

on "at least five" jurors based on their reluctance to implement the death penalty; and did not

ask if they could consider mitigating factors.  (ECF No. 60, 7-8.)  Hutton points to evidence in

the record only to support two of these arguments:  that counsel did not ask the "majority" of

prospective jurors a single question about their views on the death penalty, and that counsel did

not object to the State using peremptory challenges on "at least five" jurors based on their

reluctance to implement the death penalty.  (ECF No. 60, 7-8.)

Hutton raised this claim on direct appeal, but the Eighth District Court of Appeals did

not directly address it.  Rather, it generally held that "[a]t the guilt phase, counsel conducted the

defense in an acceptable manner."  *Hutton*, 1988 WL 39276, at *18.  Hutton did not appeal this

claim to the Ohio Supreme Court, but raised it in his first post-conviction petition.  The trial

court did not directly address this sub-claim on the merits either, but concluded that, "looking at

the allegations individually, it is clear that trial counsel . . . satisfied all requirements in his

representation" and "zealously represented his client . . . ."  (App. to Return of Writ, vol. 11,

219.)

This Court does not consider the trial court's conclusion to be contrary to, or an

unreasonable application of, *Strickland*.  The failure to ask potential jurors life-qualifying

questions is not per se ineffective assistance of counsel.  In *Witherspoon v. Illinois,* 391 U.S. 510

(1968), the Supreme Court held that it was permissible to ask prospective jurors about their

views concerning the death penalty during voir dire in capital cases.  These "death-qualifying"

questions would ensure the impartiality of jurors by allowing the State to properly exercise

challenges for cause against potential jurors unwilling to return a capital sentence.  *Id*. at 520-23.

In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court determined that defense counsel

46

had the same ability to identify those jurors who would always impose the death penalty.

*Morgan* held that "on voir dire the court must, on defendant's request, inquire into the

prospective jurors' views on capital punishment," because a prospective juror who would always

impose the death penalty must not be empaneled.  *Id*. at 726.  It declared, "If even one such juror

is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence."

*Id*. at 729.  However, as the Sixth Circuit has explained, "*Morgan* does not mandate that

life-qualifying questions be asked of potential jurors in every case.  Instead, *Morgan* holds that a

defendant has the right to life-qualify his jury upon request."  *Stanford v. Parker,* 266 F.3d 442,

454 (6th Cir. 2001).  Indeed, the Sixth Circuit has observed that "[c]ounsel is accorded particular

deference when conducting voir dire.  An attorney's actions during voir dire are considered to be

matters of trial strategy."  *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

  In this case, Hutton has not set forth any evidence as to what his counsel's strategy was

in conducting voir dire.[9]  Nevertheless, Hutton's counsel may reasonably have decided not to

question prospective jurors regarding the death penalty.  The trial court played an active role in

the *voir dire.*  He interviewed each potential juror individually in his chambers about his or her

views on capital punishment, including whether they had "any religious or moral scruples"

against the death penalty, whether they could listen to the facts and follow the law if the death

penalty was a possible sentence, and whether they could recommend the death penalty if

appropriate.  (App. to Return of Writ, Trial Tr., vol. 1, 21, 23, 24, 39, 46, 49, 64, 70, 95, 132,

137, 170, 194, 201.)  In addition, Hutton's attorney did question some prospective jurors about

their ability to examine the facts of the case and apply the law when evaluating the sentence to

---

[9]  The Court acknowledges that Hutton's trial counsel refused to cooperate with Hutton
in post-judgment discovery matters.  (ECF Nos. 50, 53.)

be imposed.  (*Id*. at 43-44, 52-53, 75-76, 129-31, 187-88.)  And he objected when the prosecutor excused for cause certain jurors who favored life sentences over the death penalty.  (*Id*. at 37-38, 340.)

The Court can only speculate as to Hutton's trial counsel's strategy.  But given the trial court's involvement, counsel may have wanted to avoid asking redundant questions, which could annoy the judge and potential jurors.  In fact, the judge admonished the prosecutor for doing just that and limited the scope of the parties' follow-up questions.  He stated, "There is no need that I see for you to repeat everything the Court has drawn from the juror by way of attitude or tendencies."  (*Id*. at 193.)  Other possible reasons for counsel's minimal questioning include that he may have been satisfied with the chosen jurors, or he may have been reluctant to draw jurors' attention to the idea of the death penalty.  *See Stanford*, 266 F.3d at 454.  Hutton has not rebutted the presumption that counsel's performance in this respect was objectively reasonable.

Hutton's claim regarding his counsel's failure to object when the State used its peremptory challenges on jurors who expressed opposition to the death penalty also fails.  The State was well within its right to do so.  *Witherspoon* and its progeny restrict only challenges *for cause* based on death-penalty views, not peremptory challenges.  *See Hicks v. Collins*, 384 F.3d 204, 224 (6th Cir. 2004) ("As long as not based on race or gender, peremptory challenges are proper."); *Dennis v. Mitchell*, 354 F.3d 511, 525 (6th Cir. 2003) (upholding peremptory challenges based on opposition to death penalty).

Finally, Hutton's complaint regarding counsel's failure to address mitigating factors with potential jurors also lacks merit.  Again, Hutton has presented no evidence regarding his

48

attorney's strategy during voir dire or specifically how he was ineffective in this respect.  This Court cannot say that the state court was unreasonable in finding defense counsel's overall performance during voir dire satisfactory.

Moreover, Hutton has not demonstrated the he was prejudiced by his counsel's conduct during voir dire.  In fact, Hutton does not address this issue at all.  He has not provided any evidence that a different set of jurors would have had a "reasonable probability" of a different result.   This claim is meritless.

### ii.    failure to conduct pretrial investigation or elicit relevant evidence from witnesses

Hutton next complains that his counsel was ineffective because he failed to conduct an adequate pretrial investigation and/or failed to elicit relevant evidence from the witnesses at trial.  In particular, he complains that his lawyer did not discover before, or develop at, trial:  the encounter Simmons' father, Samuel Simmons Sr. ("Simmons Sr."), had with three men who were looking for Simmons the night of the shootings; Simmons' and Hutton's characters and their relationship; Simmons' drug use; Simmons' and Mitchell's close friendship; Allen and Mary Pollard's experiences the night of the shooting; Sharon Book's ownership of the sewing machine; Hutton's reputation as a good neighbor; Jackie Clayton's experiences the night of the murder; Eileen Sweeney's reputation as a prostitute; the transcript of Hutton's trial for the alleged kidnapping and rape of Eileen Sweeney; and Hutton's assistance to the police in a homicide investigation.  (ECF No. 60, 8-11; ECF No. 66, 7-10.)

As noted above, Hutton raised these claims nearly verbatim in his first post-conviction petition, which he supported with eighteen affidavits of family members and friends.  (App. to Return of Writ, vol. 11, at 76-95, 98-109.)  The state court did not address the claims

individually, but rejected them as a whole.  It noted that decisions to call, examine or submit statements from witnesses is "a decision concerning trial strategy."  Therefore, it reasoned, the failure to subpoena witnesses "is a decision concerning trial strategy, and absent a showing of prejudice, does not deprive a defendant the effective assistance of counsel."  (*Id*. at 219-20.) Furthermore, it added, the court of appeals found that trial counsel "vigorously cross-examined State witnesses. . . .  [C]ounsel clearly was not ineffective . . . ."  (*Id*. at 220.)  Finally, the court determined that Hutton's supporting affidavits were not "quality" evidentiary documents, but were "specious and totally inadequate to substantiate a substantive ground for relief."  (*Id*.)

The Supreme Court has made clear that merely labeling an attorney's decision "trial strategy" does not end the inquiry; the strategic decision itself must be the product of a reasonable investigation.  The *Strickland* Court set forth this duty to investigate, explaining:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.  The Sixth Circuit has found ineffective assistance in numerous cases where counsel failed to conduct an adequate investigation, including interviewing potentially important witnesses, or did not present important testimony or evidence at trial.  *See, e.g., Ramonez v. Berghuis,* 490 F.3d 482, 491 (6th Cir. 2007) (finding ineffectiveness where counsel decided not to interview three potential witnesses who could have corroborated defendant's testimony and contradicted complaining witness' testimony); *Towns v. Smith*, 395

50

F.3d 251 (6th Cir. 2005) (finding ineffectiveness where counsel decided not to interview a potentially important witness); *Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir. 2000) (finding ineffectiveness where counsel failed to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Groseclose v. Bell,* 130 F.3d 1161, 1170 (6th Cir. 1997) (finding ineffectiveness where counsel had no strategy and conducted no investigation at all).

Nevertheless, the Supreme Court has stated that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  Accordingly, the Sixth Circuit repeatedly has concluded that an attorney's pretrial investigation and decisions in presenting evidence and testimony was reasonable given the circumstances.  *See, e.g., Landrum v. Mitchell*, 625 F.3d 905, 921-22 (6th Cir. 2010) (finding no ineffective assistance where petitioner failed to show prejudice resulting from trial counsel's failure to conduct proper investigation or interview potential witnesses, and present important lay and expert testimony); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997) (finding no ineffective assistance where counsel did not call witnesses with credibility and reliability problems).

The post-conviction court's decision rejecting Hutton's guilt-phase investigation claims does not unreasonably apply or contradict this Supreme Court precedent.  Indeed, Hutton provides virtually no legal or factual argument explaining how these claims meet the *Strickland* standard, either that counsel was deficient or that Hutton suffered any prejudice from the

51

deficiency.  The Court nevertheless will address each of Hutton's sub-claims individually.

> **a)** **Simmons Sr.'s encounter with three men looking for Simmons the night of the shootings**

For this sub-claim, Hutton argues that his counsel was ineffective because he did not question Simmons Sr. at trial about Simmons Sr.'s claim that three men came to his house the night of the murder looking for his son.  (ECF No. 66, 7.)  Hutton cites Simmons Sr.'s affidavit, in which he recounts this story and states that he told Detective Moore and Hutton's trial counsel about it.[10]  (App. to Return of Writ, vol. 11, 76-77.)  Hutton does not, however, explain the relevance of this information, why is was important to his defense, or how his counsel's decision not to use it prejudiced him.  This claim fails.

> **b)** **Simmons' and Hutton's characters and their relationship**

Hutton further complains that his counsel did not investigate or adduce evidence at trial, for impeachment purposes, the contrast between Simmons, who could not read, did not work and "everyone . . . disliked," and Hutton, who was skilled with cars and "adored by everyone," including Simmons' father.  (ECF No. 66, 7.)  Hutton contends his counsel also did not develop the fact that Hutton was an "older brother" figure to Simmons and tried to help him, but that Simmons was "always jealous of him."  (*Id*.)  Hutton points to the affidavits of Simmons Sr. and his friend William Moore Jr., who both averred as to Hutton's good character, Simmons' generally bad character and lack of credibility, and the nature of their relationship.  (App. to Return of Writ, vol. 11, 76-77, 93-95.)

Many of these facts did come out at trial, however, and additional information would

---

[10]     Although, in a puzzling contradiction, Hutton claims that his counsel did not know this story, but "would have discovered" it had he interviewed Simmons Sr. "properly."  (*Id*.)

have been cumulative.  For example, Simmons admitted at trial that he had a long criminal history and stole cars for a living.  (App. to Return of Writ, Trial Tr., vol. 2, 1009.)  He also acknowledged that he had known Hutton all of his life, and although they had disagreements, they referred to each other as brothers, and he had often relied on Hutton for help.  (*Id.* at 1012-14.)  Simmons' father testified that his son was "abusive, completely obnoxious," and that his reputation for truthfulness was "not good."  (*Id.* at vol. 3, 1846-47, 1861.)  He testified that Hutton, on the other hand, had a "very good" reputation for truthfulness.  (*Id.* at 1850.)  He also testified that Simmons and Hutton were "good friends."  (*Id.* at 1857.)  Hutton testified that he was "like an older brother" to Simmons and tried to "keep him out of trouble," although they had their "differences."  (*Id.* at vol. 4, 1999-2000.)  Hutton's counsel emphasized Simmons' lack of credibility in his closing argument by describing his criminal record and noting that he was a high school "dropout," who "never held an honest job in his life" and had a "lousy" reputation for truthfulness.  (*Id.* at 2224-27.)  He stated that "[i]t could be that he was jealous that the Defendant was going off to school and trying to make an attempt to do something with his life."  (*Id.* at 2249-50.)  This claim, too, lacks merit.

### c)      Simmons' drug use

Hutton contends in this sub-claim that his attorney was ineffective because he also failed to impeach Simmons by revealing at trial Simmons' "drug problems."  (ECF No. 66, 8.)  Hutton points to several affidavits in which the affiants note Simmons' drug use.  (App. to Return of Writ, vol. 11, 76, 84, 88.)

This information also was disclosed to the jury during the trial.  Dr. Ungvarsky, the surgical resident who examined Simmons in the emergency room after he was shot, testified at trial that Simmons had scarring over vein sites on his body, indicating intravenous drug use.

53

(App. to Return of Writ, Trial Tr., vol. 3, 1656, 1661.)  Hutton's attorney pointed this out in his

closing statement as well.  (*Id*. at vol. 4, 2226.)  This claim also fails.

### d)     Simmons' and Mitchell's close friendship

Hutton also argues that his counsel should have elicited from witnesses that Simmons

and Mitchell were "two peas in a pod," and that Hutton "tried to keep the two apart."  (ECF No.

66, 8.)  He cites Simmons Sr.'s and his friend John Hill's affidavits for support.  (App. to Return

of Writ, vol. 11, 77, 83.)

Again, this information came out at Hutton's trial.  Simmons testified, "[Mitchell and I]

was tight.  We hustled together, we scrapped together.  We was tight.  We was close."  (App. to

Return of Writ, Trial Tr., vol. 2, 885, 1092, 1231.)  Moreover, Hutton does not explain the

relevance of this information.  This claim is meritless.

### e)     Mary Pollard's experience the night of the shooting

For Hutton's next sub-claim, he assails his counsel for not eliciting "numerous matters of

exculpatory evidence" from Mary Pollard, the next-door neighbor of Hutton's mother and a

witness for the prosecution.  He argues that trial counsel should have questioned her about

whether she and her son were home the night Simmons was shot; whether Simmons asked for

Hutton's help; and whether Simmons told Hutton that he had been shot.  (ECF No. 60, 10.)

Hutton points to Mary Pollard's affidavit, in which she described the events of that night.  (App.

to Return of Writ, vol. 11, 85.)

In fact, Mary Pollard testified about each of these facts at trial.  In recounting

"everything" she could remember about the night of the murder, she stated that she and her

youngest son, Allen, were home that night, when Simmons knocked on her door crying that he

had been shot.  (App. to Return of Writ, Trial Tr., vol. 3, 1876.)  She stated on cross-examination that her son answered the door, but that she saw what transpired from a window on her stairway that faced the front of the house.  (*Id*. at 1885.)  She said that Hutton then called for Simmons to come out from the back yard, which Simmons did.  She testified that Simmons looked pleased to see Hutton, told Hutton he had been shot, and got in Hutton's car voluntarily. (*Id*. at 1877-78, 1887-89.)  Thus, Mary Pollard testified at length as to what she witnessed the night Simmons was shot and was cross-examined by Hutton's defense counsel regarding her story. Her affidavit adds nothing to her testimony.    This claim, too, lacks merit.

> ### f)       Allen Pollard's experience the night of the shooting

Hutton also complains that his counsel did not interview Allen Pollard, who would have established that Simmons had told Hutton outside his house that he had been shot, asked Hutton to take him to the hospital, and showed no fear of Hutton.  (ECF No. 66, 8.)  Hutton cites Allen Pollard's affidavit for support.  (App. to Return of Writ, vol. 11, 87.)  As explained above, Allen Pollard's mother, Mary, covered nearly all of this material during her trial testimony.[11]  Allen Pollard's testimony, therefore, would have been cumulative, and this claim fails.

> ### g)       Sharon Book's ownership of the sewing machine

Hutton contends in this sub-claim that his counsel was ineffective for not establishing that the sewing machine at issue in this case belonged to Sharon Book and not to Hutton's sister as "relied upon by the Ohio Supreme Court in upholding the conviction."  (ECF No. 66, 8.)  But this argument is unpersuasive.  Hutton testified that the sewing machine belonged "[t]o the lady

---

[11]       In fact, neither Mary nor Allen claim that Simmons asked Hutton to take him to the hospital; they claim only that Simmons got in the car with Hutton, and the car drove off.  (App. to Return of Writ, Trial Tr., vol. 3, 1888-89, 1897; App. to Return of Writ, vol. 11, 87.)

upstairs, Sharon Book." (App. to Return of Writ, Trial Tr., vol. 4, 1915.)  He explained on cross-examination that he met Book when he fixed her car about one and a half years before. (*Id*. at 2002-03.)  Hutton's counsel also stated that Hutton did not own the sewing machine in his closing argument.  (*Id*. at 2243.)  Furthermore, the Ohio Supreme Court did not even state that the sewing machine belonged to Hutton's sister.  It stated that the machine belonged to Hutton. *Hutton*, 53 Ohio St. 3d at 36, 41, 559 N.E.2d at 436, 439.  The only reference the court made to a sister of Hutton's is Simmons' testimony that Hutton accused Mitchell of "breaking in my sister's house." *Id.* at 41, 559 N.E.2d at 439.  (*See* App. to Return of Writ, Trial Tr., vol. 2, 960.)[12]  Finally, Hutton does not explain why this is important, although the Court presumes it is relevant to question why Hutton would hide his money in someone else's sewing machine.  This claim fails.

### h)   Hutton's reputation as a good neighbor

Hutton next claims that his counsel should have established at trial that Hutton was a good neighbor, undermining the prosecution theory that he committed murder to avenge the robberies of a sewing machine and tires and supporting the defense position that Hutton was merely attempting to help his neighbor, as he often had done.  (ECF No. 66, 8-9.)  Hutton cites the affidavits of family friend Yvonne Lassiter and his sister, Diane Banks.  (App. to Return of Writ, vol. 11, 81-82, 88-89.)

In fact, Hutton's counsel tried to elicit this information from Mary Pollard, but was

---

[12]   Hutton asserts that "[t]here is no evidence in the record other than this testimony that Hutton even had a sister." (ECF No. 66, 17.)  But Hutton does indeed have a sister; his older sister, Diane Banks, submitted one of the affidavits in support of Hutton's first post-conviction petition. (App. to Return of Writ, vol. 11, 88.)  The sister at issue here also may be Celeste Laster, co-defendant Bruce Laster's sister and Hutton's fiancé, who was going to live with Hutton in the house from which the sewing machine was stolen.  (*Id*., Trial Tr., vol. 3, 1886.)

largely unsuccessful.  She did testify, however, that Hutton "was well liked in the community."

(App. to Return of Writ, Trial Tr., vol. 3, 1590.)  She also testified that she had "never known

[Hutton] to have been violent towards someone" (*id*. at 1592), although this testimony opened

the door on redirect to questioning about Hutton's prior murder charge.  (*Id*. at 1589-92,

1598-99.)  This claim is meritless.

> ### i)      Jackie Clayton's experiences the night of the murder

For this sub-claim, Hutton argues that his counsel was deficient because he "failed to

issue a subpoena" for Jackie Clayton.  He claims that she would have testified that Simmons

owed a drug dealer money at the time of the murder and that Simmons was jealous of Hutton.

(ECF No. 66, 9.)  As explained above, there was testimony at the trial concerning both

Simmons' drug use and his relationship with Hutton.  This claim fails.

> ### j)      Eileen Sweeney was a prostitute

Hutton also complains that his counsel should have elicited the fact that Eileen Sweeney

was a prostitute.  (ECF No. 66, 9.)  The only evidence Hutton offers to support this is the

statement of his daughter, Pamela Hutton, in her affidavit.  (App. to Return of Writ, vol. 11,

101.)  Hutton does not explain why this information is relevant.  Moreover, Hutton's counsel

tried to get this information into the record.  He asked Celeste Laster when she testified if she

knew what Sweeney did for a living; she said she did, but the prosecution objected when defense

counsel asked her what that was, and the court sustained the objection.  (App. to Return of Writ,

Trial Tr., vol. 3, 1908.)  As the trial court undoubtedly recognized, this information is irrelevant.

This claim lacks merit.

> ### k)      the transcript of Hutton's kidnapping and rape case

Hutton further argues that his trial counsel should have obtained the transcript of his trial for the kidnapping and rape of Eileen Sweeney, which resulted in an aquittal.  (ECF No. 60, 11.) This would have been impossible, however, because the rape trial had not yet occurred. Hutton's murder trial ended in February 1986; his rape trial did not take place until March1987. (*See* App. to Return of Writ, vol. 11, 96.)

> l)    **Hutton's assistance to the police with two homicide investigations**

For his next sub-claim, Hutton contends that his counsel failed to elicit evidence that Hutton assisted the police in two homicide investigations.  (ECF No. 60, 11.)  Hutton points to his mother's affidavit, in which she mentions this episode.  (App. to Return of Writ, vol. 11, 80.) Hutton again does not explain how this evidence would have supported his defense.

However, this evidence did come out at trial.  Detective Moore testified on cross-examination that he had known Hutton before his investigation in this case because Hutton had helped him with a previous homicide investigation.  (App. to Return of Writ, Trial Tr., vol. 3, 1727-28.)  Hutton's counsel also included that fact in his closing argument.  (*Id*. at vol. 4, 2204.) This claim also fails.

> m)    **conclusion**

Thus, it was not objectively unreasonable for the Ohio state court to hold that the investigation and presentation of evidence by Hutton's attorney did not fall "below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  Hutton has not demonstrated either that counsel performed unreasonably in failing either to conduct a sufficient investigation or to elicit certain testimony or evidence at trial; nor did he show that this aspect of counsel's performance prejudiced him in any way.  Most of the testimony and evidence that Hutton claims

58

was omitted through his counsel's neglect was indeed developed at trial and would have been of little value.  Other evidence at issue would have been inadmissible on relevancy or other grounds (which was demonstrated when the trial court sustained objections to defense counsel's questioning concerning Sweeney's occupation and Hutton's neighborliness, for example).  And some of the evidence simply did not exist.  *See Strouth v. Colson*, 680 F.3d 596, 602 (6th Cir. 2012) ("It is not easy to satisfy *Strickland* through the failure to impeach prosecution witnesses when the impeachment evidence is weak and cumulative, and the evidence of the defendant's guilt is "overwhelming," all true here.").

### c.     penalty phase

#### i.     counsel's failure to investigate and present sufficient mitigating evidence

Hutton's strongest ineffective-assistance claim relates to his trial counsel's performance during the penalty phase of his trial.  Hutton's mitigation case rested on a residual doubt theory, adduced through Hutton's unsworn testimony,[13] the PSI, and his attorney's closing argument. Hutton argues that his attorney presented "[n]o evidence in mitigation" when the following evidence was readily available:  Hutton assisted the police in the investigation of two homicides; he acted as a "guardian angel" for his neighborhood, helping children and the elderly; he turned himself in to the police; he was skilled in karate, art and auto repair; he respected education; he abstained from drugs and alcohol; he was well-liked; he went to church; and he had a positive relationship with his daughter.  (ECF No. 66, 24, 28-30.)  Hutton states that his attorney should

---

[13]     The Ohio court of appeals provided this summary of Hutton's unsworn statement: "(1) [he] was convicted for an incident which occurred one week prior to the alleged murder; (2) there was no truth to the shooting and disappearance of Derek Mitchell; (3) [he] was sorry that Derek Mitchell was dead; (4) [he] possessed no intentions to harm Derek Mitchell; and (5) Eileen Sweeney had lied about her alleged rape."  *Hutton*, 72 Ohio App. 3d at 352, 594 N.E.2d at 695.

have identified and prepared witnesses to testify about this evidence, obtained employment,

medical, legal and other agency records, and hired a psychologist for assistance.  (*Id.* at 27, 30.)

To support these claims, Hutton again cites the eighteen affidavits of family members

and friends submitted to the trial court in his post-conviction proceedings.  (App. to Return of

Writ, vol. 11, at 76-95, 98-109.)  He also points to a 1987 Cuyahoga County Court of Common

Pleas journal entry recording his acquittal of the rape and kidnapping of Eileen Sweeney (*id.* at

96); a newspaper article referencing his help to police in a homicide investigation (*id.* at 97); and

a 1980 appellate court opinion reversing a prior murder conviction of Hutton (*id.* at 110-18),

which he also submitted to the post-conviction court.

The trial court denied Hutton's post-conviction ineffective-assistance claim on this

ground.  It first observed,

> As the Appellate Court noted, trial counsel acted as a zealous advocate in his
> presentation of mitigating evidence.
>
> Trial counsel re-emphasized to the jury at the sentencing phase
> petitioner's unsworn statement of innocence, he spoke of a psychiatric report,
> reminded the jury of petitioner's reversal of his voluntary manslaughter
> conviction, and "excused away" his juvenile record. . . .  Therefore, trial counsel
> was not ineffective in his assistance to petitioner.

(*Id.* at 219.)  The court further noted, in conjunction with Hutton's guilt-phase investigation

claim, that decisions to call, examine or submit statements from witnesses is "a decision

concerning trial strategy."  The failure to subpoena witnesses, therefore, "is a decision

concerning trial strategy, and absent a showing of prejudice, does not deprive a defendant the

effective assistance of counsel."  (*Id.* at 219-20.)  Furthermore, it added, the court of appeals

found that trial counsel "vigorously cross-examined State witnesses. . . .  [C]ounsel clearly was

not ineffective . . . ."  (*Id.* at 220.)  Finally, the court determined that Hutton's supporting

60

affidavits were not "quality" evidentiary documents, but were "specious and totally inadequate to substantiate a substantive ground for relief."  (*Id*.)

The Supreme Court repeatedly has held that counsel in a capital case have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000).  In *Strickland*, the Supreme Court noted that a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable: "to ensure that the adversarial testing process works to produce a just result under the standards governing decision."  *Strickland*, 466 U.S. at 686.

Accordingly, the Supreme Court and Sixth Circuit have found ineffective assistance of counsel in capital cases where trial counsel failed to investigate or present mitigating evidence at sentencing.  *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (petitioner had an "excruciating life history," yet counsel focused exclusively on his direct responsibility for murder); *Rompilla*, 545 U.S. at 389-93 (counsel ineffective where he failed to examine court file of defendant's prior conviction which contained a range of vital mitigation leads regarding defendant's childhood and mental health problems); *Frazier v. Huffman*, 343 F.3d 780, 795-99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury).

Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  *Rompilla*, 545 U.S. at 383. *See, e.g., Wiggins*, 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise

. . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S. 776 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).  The Supreme Court has advised, "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.

The issue for this Court, therefore, is whether, in applying § 2254(d)(1), the Ohio court was unreasonable in concluding:  (1) that Hutton had not overcome the strong presumption of competence by proving his counsel's deficient performance in his preparation for and presentation during the sentencing phase of the trial; and (2) that Hutton had failed to demonstrate a reasonable probability that a jury presented with this additional mitigating evidence would have imposed a different sentence sufficient to undermine confidence in the outcome.  *See Pinholster*, 131 S. Ct. at 1403.

The Court finds that the state court was not unreasonable in denying Hutton's claims related to his counsel's performance in preparing for and presenting evidence during the penalty phase of his trial.  First, contrary to Hutton's assertion, his trial counsel did present relevant mitigating evidence to the jury.  As the post-conviction court noted, "Trial counsel re-emphasized to the jury at the sentencing phase petitioner's unsworn statement of innocence, he spoke of a psychiatric report, reminded the jury of petitioner's reversal of his voluntary manslaughter conviction, and 'excused away' his juvenile record."  (App. to Return of Writ, vol. 11, 219.)  Moreover, much of the evidence Hutton claims would have assisted him in mitigation was introduced during the guilt phase of the trial.  There was testimony, for example, about Hutton's assistance to police during a homicide investigation (App. to Return of Writ, Trial Tr.,

62

vol. 3, 1727-28); his voluntary surrender to police (*id.* at vol. 4, 1963-65); his work in auto repair and future business plans (*id.* at vol. 3, 1592, 1868; vol. 4,1928-29, 1986-87); his karate training (*id.* at 1912-13); his commitment to education (*id.* at 1912-13, 1929, 1958-59, 1979, 2077); his abstinence from alcohol (*id.* at 2077); and his reputation for honesty and helpfulness (*id.* at vol. 3, 1590-91, 1850-51).  The PSI also contained information regarding Hutton's family background and character.  (*Id.* at vol. 4, Ct. Ex. B.)

The Ohio Supreme Court also noted, in finding no error in the prosecution's "potentially prejudicial" comments regarding Hutton's prior criminal record, that "the evidence in mitigation was meager, consisting mainly of Hutton's protestations of innocence.  The PSI also mentioned that Hutton's father had died and that his stepfather abandoned his family when Hutton was a child."  *Hutton*, 53 Ohio St. 3d at 44, 559 N.E.2d at 442.  And the court later summarized the mitigating evidence in the record in its review of Hutton's sentence, finding:

> *History, character and background*:  Hutton was born on October 28, 1953.  The pre-sentence investigation report shows that his father died in 1963, when Hutton was still a child.  Although it is not clear whether Hutton's mother and father were ever divorced, Hutton's mother remarried in 1960.  However, her second husband abandoned the family in 1965.  Hutton was self-employed as an automotive mechanic.  Before he surrendered to Detective Moore, he was taking courses in that field at Lincoln Technical Institute.  He testified in the guilt phase that he had also been employed as a security guard and had completed a six-week, 120-hour course of "security [and] private police training" at Case Western Reserve University.  He had also been on general relief and food stamps "off and on" since 1981, and he admitted that he had never reported his income from repairing cars to the welfare authorities.  There was also guilt-phase testimony about Hutton's good reputation.  Samuel Simmons Sr., the father of victim Samuel Simmons Jr., testified in the guilt phase that Hutton had a "very good" reputation for truthfulness.  Simmons Sr. also testified that he "would put [his] life in [Hutton's] hands any day."  We give some mitigating weight to Hutton's history, character, and background.

*Hutton,* 100 Ohio St. 3d at 189-91, 797 N.E.2d at 963.

Much of the evidence Hutton claims should have been presented to the jury in

63

mitigation, therefore, would have been cumulative to what already was before it, and the failure to present it does not form the basis of an ineffective-assistance claim.  As the Sixth Circuit has observed, "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation."  *Eley v. Bagley*, 604 F.3d 958, 968 (6th Cir. 2010) (quoting *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007)).[14]

Hutton claims that his counsel should have discovered more mitigating evidence, from other family members and friends, medical, legal and school records, and a psychologist. However, Hutton has set forth no evidence that suggests that these witnesses, records or an expert would have helped him in mitigation.  Indeed, the likelihood that additional mitigating evidence exists is minimal given that Hutton has had access to these witnesses and records throughout his appeals, but has failed to unearth anything significant enough to submit to a court, including this one.[15]  For example, Hutton's mother and sister explain in their affidavits that Hutton was hospitalized as a child for two years for a "nervous condition" possibly related to his "very abusive, violent" stepfather.  (App. to Return of Writ, vol. 11, 79, 89.)  Despite the potentially probative value of this type of evidence, Hutton does not include this episode among

---

[14]    The Ohio Supreme Court also found Hutton's counsel did in fact investigate mitigating evidence as demonstrated by testimony that was introduced during the guilt phase of his trial as to his intelligence and good character, and that "it [is] a plainly reasonable exercise of professional judgment not to repeat the same testimony in the penalty phase."  *Hutton*, 53 Ohio St. 3d at 49, 559 N.E.2d at 446.

[15]    Although this Court is now limited to the state-court record in its consideration of Hutton's ineffective-assistance claims, *see Pinholster*, 131 S. Ct. at 1398, the Court notes that Hutton never advised it of the existence of relevant mitigating evidence obtained since post-conviction proceedings or pursuant to discovery conducted in this habeas action, nor sought to include such evidence in the record.  (*See* ECF Nos. 45*,* 50, 53, 54.)

the mitigating evidence his counsel missed, much less offer any proof that it actually occurred. Furthermore, the type of mitigating evidence Hutton does offer is "neither complex nor technical.  It required only that the jury make logical connections of the kind a layperson is well equipped to make.  The jury simply did not need expert testimony to understand the 'humanizing' evidence; it could use its common sense or own sense of mercy."  *Wong v. Belmontes*, 558 U.S. 15, 388 (2009).

There also is nothing in the record to prove what mitigating evidence Hutton's trial counsel was aware of, the extent of his efforts to prepare for mitigation, or what his strategy was.  Aside from the affidavits submitted in post-conviction, which show that Hutton's attorney did not interview certain family members and friends, the Court has "'no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'" *Yarborough v. Gentry,* 540 U.S. 1, 8 (2003) (quoting *Massaro v. United States*, 538 U.S. 500, 505 (2003)).[16]

The Supreme Court in *Strickland* noted that one factor behind a strategic choice not to pursue a line of inquiry could be the defendant himself.  It explained,

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.

---

[16]     The Ohio Supreme Court also denied Hutton's claim that his attorney failed to investigate possible mitigating evidence on this ground, observing: "[T]he record does not show what investigations counsel did or did not make.  Since it is Hutton's burden to show that his counsel's performance was deficient, his claim lacks merit."  *Hutton*, 53 Ohio St. 3d at 48-49, 559 N.E.2d at 446.

> And when a defendant has given counsel reason to believe that pursuing certain
> investigations would be fruitless or even harmful, counsel's failure to pursue
> those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691.  Hutton stated in his unsworn statement, "I could have brought

people in here to prove that I wasn't [a cut-throat person], but that didn't have nothing to do

with the case. . . .  I could have did a lot of things that didn't have nothing to do with this

particular case, but I didn't due to the fact that I call myself."  (App. to Return of Writ, Trial Tr.,

vol. 4, 2384.)  Hutton also did not disclose his psychiatric treatment as a child to the psychiatrist

who completed his court-ordered psychiatric evaluation, and he may have chosen not to discuss

it with his trial attorney as well.  (*Id*. at Ct. Ex. C, 2 ("There is no past history of any mental

problems or treatment for any mental illness which was documented or claimed by the

defendant.").)

The Supreme Court repeatedly has held that counsel is not ineffective for deciding to

offer little or no mitigating evidence where that decision is based on sound professional

judgment.  *See*, *e.g., Bell v. Cone*, 535 U.S. 685, 702 (2002)*; Strickland*, 466 U.S. at 699-700;

*Burger*, 483 U.S. at 793-75; *Darden v. Wainwright*, 477 U.S. 168, 184 (1986). As the Court has

explained,

> [T]here comes a point at which evidence from more distant relatives can
> reasonably be expected to be only cumulative, and the search for it distractive
> from more important duties. . . .  This is not a case in which the defendant's
> attorneys failed to act while potentially powerful mitigating evidence stared them
> in the face, or would have been apparent from documents any reasonable attorney
> would have obtained.  It is instead a case, like *Strickland* itself, in which defense
> counsel's "decision not to seek more" mitigating evidence from the defendant's
> background "than was already in hand" fell "well within the range of
> professionally reasonable judgments."

*Bobby v. Van Hook*, 558 U.S. 4, 19 (2009) (internal citations omitted).

Thus, Hutton has not "overcome the presumption that, under the circumstances, the

66

challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689.  The

Court concludes that the state court was not unreasonable in its finding that Hutton's counsel did

not perform below an objective standard of reasonableness in preparing for the penalty phase of

trial.

Moreover, even if Hutton could show that his counsel's performed deficiently by not

uncovering more mitigating evidence, he suffered no prejudice as a result.  Hutton cannot show

"a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the

balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466

U.S. at 695.  There must be a "reasonable probability that at least one juror would have struck a

different balance." *Wiggins*, 539 U.S. at 537.

The mitigating evidence adduced at trial, described above, was weak.  Moreover, the

affidavits submitted on post-conviction by the potential witnesses demonstrate that their

testimony would have added little of value.  The affidavits portray Hutton as a good father, son,

brother and neighbor.  They attest to Hutton's honesty, good nature, sobriety, church attendance,

hard work, and skill with cars and karate.  The state courts that reviewed these affidavits found

them to be insubstantial.  The post-conviction court stated that they were "specious and totally

inadequate to substantiate a substantive ground for relief."  (App. to Return of Writ, vol. 11,

220.)  The court of appeals agreed, stating that "Hutton submitted thirteen affidavits from family

and friends who all claim Hutton is a good man.  Several of the affidavits rely on hearsay. . . .

None of these affidavits establish a substantive ground for relief." *Hutton*, 2004 WL 157248, at

**2-3.  In addition, the Sixth Circuit often has viewed this type of evidence as having little

mitigating value. *See, e.g., Moore v. Mitchell*, 708 F.3d 760 (6th Cir. 2013) (reversing district

court's grant of relief based on ineffective-assistance claim for failure to investigate where

67

"there were no accounts of parental abuse and neglect, no history of witnessing violence, no indication of low intelligence, nor evidence of any of the typical mitigation factors."); *Strouth*, 680 F.3d 596, 604 (6th 2012) (petitioner did not demonstrate the "extreme deprivation or mental and emotional problems" found in cases where ineffective assistance was found).  *Cf. Wiggins*, 539 U.S. at 535 (petitioner "suffered physical torment, sexual molestation, and repeated rape" during childhood); *Foust v. Houk*, 655 F.3d 524, 539-44 (6th Cir. 2011) (petitioner lived in home with "uninhabitable living conditions," including feces smeared on the wall, vomit on the floor, piles of garbage and dirty laundry stacked throughout the home, and insect and rodent infestation; he and his siblings regularly suffered brutal beatings; his brothers raped his sisters and threatened them with death); *Sowell v. Anderson*, 663 F.3d 783, 791-93 (6th Cir. 2011) (petitioner's infant brother died of starvation; his father repeatedly beat him and sexually molested his sister, threatening to burn her alive if she reported it; he and his siblings were bitten by rats and infected with worms).

Furthermore, while the mitigating evidence Hutton proffers would have contributed little to Hutton's chances of obtaining a life sentence, it may have exposed him to potentially damaging rebuttal and cross-examination.  *See, e.g., Strickland*, 466 U.S. at 699 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in.").  This risk was realized when the prosecution introduced Hutton's criminal record after Mary Pollard testified about Hutton's non-violent nature.  (App. to Return of Writ, Trial Tr., vol. 3, 1587-1601.)

On the other hand, the jury found the murder was conducted with prior calculation and design as well as two statutory aggravating circumstances, course of conduct and felony murder.

68

Even more damaging, the jury heard "the most powerful imaginable aggravating evidence" when they learned that Hutton had already been charged with a murder.  *Wong,* 130 S. Ct. at 391 (rejecting petitioner's "'more-evidence-is-better' approach to mitigation" where it would have opened door to evidence of past murders).  The jury also learned that Hutton had been charged with Eileen Sweeney's rape and had served time in jail for armed robbery.

Thus, it is possible that Hutton's counsel could have conducted a more thorough investigation into, and presentation of, mitigating evidence than he did.  Nevertheless, in considering claims of ineffective assistance of counsel, habeas courts "address not what is prudent or appropriate, but only what is constitutionally compelled."  *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984).  The totality of mitigating evidence introduced at trial and offered here does not create a reasonable probability of a life sentence when weighed against the aggravating circumstances; and the state court's finding, that Hutton suffered no prejudice from his counsel's performance in the penalty phase of trial, was not objectively unreasonable.  This sub-claim, therefore, lacks merit.

   ii.  **counsel's failure to argue residual doubt theory in mitigation or request residual doubt jury instruction**

Hutton also complains that his trial counsel failed to present a residual doubt theory to the jury during his closing argument in mitigation and failed to request a residual doubt jury instruction.  (ECF Nos. 60, 24; 66, 28.)  This Court disagrees.

First, Hutton's counsel did in fact clearly and expressly raise the issue of residual doubt in his penalty-phase closing argument.  He argued, for example,

> Our position, the Defendant's position, I guess the best mitigating circumstances that anybody could come up with, and that's that in spite of the fact that you all found him guilty . . . but notwithstanding what you have indicated your belief was with respect to the evidence that was presented, what

this man is trying to tell you is that he didn't do it.  He didn't do it.

In spite of the fact that you have indicated that you are convinced beyond a reasonable doubt that he did, and as the Judge took pains to inform you during the course of time that he was charging the Jury, reasonable doubt does not mean 100 percent certainty.  It doesn't, because people are indeed always subject to some forms of doubt, some forms of that.

But what we are trying to tell you is . . . is that in spite of what your opinion with respect to guilt or innocence is, maybe you were wrong.  Just maybe you were wrong.  Maybe you believe Sam and Sam is lying.

(App. to Return of Writ, Trial Tr., vol. 4, 2402-03.)

As to counsel's failure to request a residual doubt jury instruction, Hutton has not provided any argument whatsoever to show that this claim meets the *Strickland* standard, either that counsel was unconstitutionally deficient or that Hutton suffered any prejudice.  This sub-claim, therefore, is waived.  *See United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address Cosgrove's general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

### iii.    counsel's failure to object to jury instructions

Hutton also claims that his counsel should have objected to certain jury instructions, including the definition of aggravating circumstance, the inclusion of statutory mitigating factors that did not apply, and the use of the term "recommend" in the death penalty instruction.  (ECF No. 60, 11, 27; ECF No. 66, 24.)  Each of these claims is meritless.

Regarding counsel's failure to object to the trial court's definition of aggravating circumstance, the Court finds that the trial court did not commit a constitutional error in this

70

regard, and it therefore cannot form the basis of an ineffective-assistance claim.  *See infra* Section VI.G.  As to counsel's failure to object to the trial court's inclusion of statutory mitigating factors that did not apply, Hutton's only support for this argument is the conclusory statement that "this had the effect of allowing the non-present mitigation factors to be considered as a non-statutory aggravating factor."  (ECF No. 66, 27.)  Again, Hutton has not provided sufficient argumentation to demonstrate how this claim meets the *Strickland* standard, and this claim is waived.

The Ohio Supreme Court was the last court to address Hutton's claim regarding counsel's failure to object to the trial court's term "recommend" in the death penalty instruction. It found no ineffective assistance because the trial court gave "a completely correct statement of law."  *Hutton*, 53 Ohio St. 3d at 49, 559 N.E.2d at 446.  Hutton also provides no argument to support this claim, and the Court finds this decision reasonable.

> **iv.** **counsel's failure to consult with him about mitigation and prepare him for his unsworn statement**

Hutton further complains that his attorney was ineffective for failing to adequately consult with him regarding mitigation and prepare him for his unsworn statement.  (ECF No. 60, 26; ECF No. 66, 30.)  These claims also are conclusory, lack argumentation, and are waived.

> **v.** **counsel's failure to object to the admission of the PSI and to the prosecution's references to the criminal record contained in it**

Hutton contends in this sub-claim that his counsel was deficient for failing to object to the PSI's admission and to the prosecution reading his criminal record from it.  (ECF No. 60, 26; ECF No. 66, 24.)  He argues that "[t]his allowed the jury to consider the invalid prior homicide as a non-statutory aggravating factor," which "was particularly prejudicial as Hutton was

charged with a course-of-conduct capital specification."  (ECF No. 66, 24.)

Hutton requested the PSI after his conviction.  The Ohio Supreme Court explained that the report, prepared by the probation department,

> listed Hutton's criminal charges since 1967 and indicated the disposition of each charge.  Two of the listed charges resulted in delinquency adjudications and five resulted in criminal convictions.  One other charge resulted in probation.  Six charges were listed as "Released" or "No disposition."  The charges on which Hutton had just been tried were listed as "Pending."  A pending rape case against Hutton [involving Eileen Sweeney] was also listed.

*Hutton*, 53 Ohio St. 3d at 42, 559 N.E.2d at 440.  The PSI did not indicate that convictions for voluntary manslaughter, felonious assault, and abduction were reversed on appeal.  *Id*. at 43, 559 N.E.2d at 441-42.  (*See* App. to Return of Writ, Trial Tr., vol. 4, Ct. Ex. B.)

The last state court to address this claim on the merits, the Ohio Supreme Court,[17] held that Hutton's counsel's performance with regard to the PSI was not ineffective.  First, the court rejected a *per se* rule that a request for a PSI constitutes ineffective assistance.  The court reasoned,

> The record does not show counsel's thought processes, nor does it show a failure to "make reasonable investigations . . . ."
>
> It may be, for instance, that counsel conducted a diligent investigation, but was simply unable to find substantial mitigating evidence.  In such circumstances, an attorney might logically decide to take the chance that a PSI may produce something he had missed, even at the risk of disclosing his client's criminal record.  Since the record does not rebut the presumption that counsel performed reasonably, we cannot hold that counsel's mere request for a PSI was ineffective assistance.

*Hutton*, 53 Ohio St. 3d at 42, 559 N.E.2d at 441 (quoting *Strickland*, 466 U.S. at 691).  The

---

[17]    Hutton raised this sub-claim in his first post-conviction petition, but the court, after finding all of Hutton's ineffective-assistance claims barred by res judicata, did not address it either generally or specifically as it did with other sub-claims.

court next disagreed that Hutton's counsel should have excised Hutton's arrest record from the report.  It noted that Ohio's statute governing PSIs and mitigation in capital cases is silent on the issue of arrests and therefore leaves the matter to the discretion of the trial judge.  *Id.* at 42-43, 559 N.E.2d at 441.  The court added,

> We recently held that the concept of "social history" [referenced in the criminal procedure rule regarding PSIs] is broad enough to include allegations of wrongdoing even though the wrongdoing did not result in criminal charges. . . . [The arrests reported in Hutton's PSI] are part of his "prior criminal record" . . . .
>
> A pre-sentence investigation report in a capital case may include the defendant's arrest record.  It follows that counsel's failure to seek its exclusion was not professionally unreasonable.

*Id*. at 43, 559 N.E.2d at 441.  The court also held that the prosecutor reading his juvenile record to the jury was not objectionable, because "the record was part of the PSI, and therefore subject to fair comment by the prosecutor."  *Id*. at 49, 559 N.E.2d at 446.

The Ohio Supreme Court's decisions on these ineffective-assistance sub-claims are not contrary to, or an unreasonable interpretation of, *Strickland*.  The Ohio Supreme Court held that the PSI was admissible under Ohio law, and its admission or use, therefore, cannot provide the basis for an ineffective-assistance claim.  Hutton does not point to any Ohio or federal law to the contrary.  The one case he cites, *Zant v. Stephens*, 462 U.S. 862, 878 (1983), without any discussion, does not help him.

In *Zant*, the Supreme Court reviewed a Georgia jury's death sentence based on a showing of several aggravating circumstances, one of which was that the defendant had "a substantial history of serious assaultive criminal convictions."  The Georgia Supreme Court had found that aggravating circumstance impermissibly vague, but upheld the sentence based on the jury's finding of two other, permissible aggravating factors.  *Id*. at 866.  The Court held that the

73

verdict was adequately supported by the two unchallenged aggravating factors, which fulfilled the constitutional requirement that "an aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id*. at 877-79.  It further found that evidence of the defendant's prior convictions was properly adduced at the sentencing hearing and fully subject to explanation by the defendant.  *Id.* at 886-87.  The Court explained,

> statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition:  they circumscribe the class of persons eligible for the death penalty.  But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.  What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

*Id.* at 878-79 (emphasis original).  The Court distinguished the criminal-history circumstance at issue, which was invalid because it was too vague, from aggravating circumstances that are invalid because they "authorize[] the jury to draw adverse inferences from conduct that is constitutionally protected"; or attach the "aggravating" label to factors that are constitutionally impermissible or irrelevant, such as race, religion or political affiliation, or to conduct that actually should militate in favor of a lesser sentence, such as mental illness.  The application of those types of circumstances might require a jury's death sentence to be set aside if invalidation makes the death penalty arbitrary or capricious.  *Id*. at 887-88.  In fact, the Court  stated, "Nothing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination . . . even though the defendant's prior history of noncapital convictions could not *by itself* provide sufficient justification for imposing the death sentence."  *Id*. at 888

74

(emphasis original).

Thus, although *Zant* "left open the possibility that in a weighing State infection of the process with an invalid aggravating factor might require invalidation of the death sentence," *Stringer v. Black*, 503 U.S. 222, 230 (1992), it made clear that a jury may consider a defendant's prior criminal history once it has identified a valid aggravating factor. In fact, *Zant* established that "once a defendant is found eligible for death based on a constitutionally sufficient narrowing circumstance, the sentencer's discretion is virtually unlimited." *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2004).

Here, the jury imposed Hutton's death sentence on two valid aggravating circumstances under Ohio law, prior calculation and design and felony murder. Ohio Rev. Code §§ 2929.04(A)(5), (7). The jury's sentence, therefore, was based on "constitutionally sufficient narrowing circumstances," and the evidence of his criminal record contained in the PSI was properly before them to consider. It follows, then, that the failure to object to the report's admission and to the prosecution's references to it does not constitute ineffective assistance of counsel.

### vi.     counsel's failure to object to prosecution references to statutory mitigating factors that do not apply

Hutton argues for his next sub-claim that his trial counsel was ineffective for failing to object to prosecution references to statutory mitigating factors that do not apply. (ECF No. 60, 27.) The Court rejects this claim for the same reason it rejects Hutton's claim that counsel should have objected to the court's jury instruction that improperly included statutory mitigating factors that did not apply. *See supra* Section VI.A.2.c.iii.

### vii.    counsel's failure to object to the trial court's inclusion of a firearms specification in the indictment

Hutton finally contends that counsel failed to object to the trial court's inclusion of a firearms specification in the indictment, which was submitted to the jury.  His sole reasoning for this claim is that "[t]his inclusion was especially damaging . . . because the jury was not informed which of the specifications could be considered in the sentencing weighing process." (ECF No. 66, 27.)  The Ohio Supreme Court correctly and reasonably denied this claim on the ground that the jury was not instructed that the firearm specification was an aggravating circumstance.  *Hutton,* 53 Ohio St. 3d at 49, 559 N.E.2d at 446.  This claim lacks merit.

### d.      conclusion

Thus, this Court finds that the state courts reasonably determined that Hutton's trial counsel did not perform so deficiently that there was a reasonable probability that the jury would have returned a different verdict or would have imposed a different sentence.

### B.      *Eleventh Ground for Relief:  Ineffective Assistance of Appellate Counsel*

Hutton argues in his eleventh ground for relief that his appellate counsel also failed to provide constitutionally effective assistance of counsel.  He claims that his counsel failed to raise three meritorious issues in his first direct appeal to the Eighth District Court of Appeals. They are:  the trial court improperly instructed jurors about, and the prosecution improperly commented on, mitigating factors that did not apply; ineffective assistance of trial counsel for failure to object to the improper jury instructions and prosecution comments; and ineffective assistance of trial counsel for failure to object to the trial court's failure to define "aggravating" factors.  Hutton argues that his appellate counsel also failed to raise certain issues on cross-appeal to the Ohio Supreme Court.  Those are:  sufficiency of evidence, other acts evidence, improper limitation of cross-examination, prosecutorial misconduct, and ineffective assistance

76

of counsel in the penalty phase.  (ECF No. 60, 39-43; ECF No. 66, 79-85.)

### 1.    Procedural Posture

The Ohio Supreme Court accepted these claims for review through Hutton's *Murnahan* motion and reviewed each of them on the merits.  *Hutton*, 100 Ohio St. 3d at 183, 797 N.E.2d at 957 ("Accordingly, Hutton's claims that he received ineffective assistance in *Hutton I* are not res judicata, and we proceed to the merits of those claims.").  These claims are therefore preserved and ripe for habeas review.

### 2.    Merits

The Court finds, however, that they lack merit.  A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel.  Thus, Hutton must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable.  *Strickland,* 466 U.S. at 687.  In reviewing the Ohio Supreme Court's conclusions under § 2254(d)(1), this Court must determine "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 131 S. Ct. at 788.  However, an appellant has no constitutional right to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome."  *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

### a.    trial court's and prosecution's references to mitigating factors that did not apply

Hutton first argues that his appellate counsel failed to raise on direct appeal his claim that the trial court improperly instructed jurors about, and the prosecution improperly commented on, mitigating factors that did not apply.  The Ohio Supreme Court addressed this claim, explaining:

> The trial court, in its penalty-phase jury instructions, listed all seven of the statutory mitigating factors in R.C. 2929.04(B), and the prosecutor discussed all seven in his closing argument, even though several were not raised by the defense.  Citing *State v. DePew* (1988), 38 Ohio St. 3d 275, 289-290, 528 N.E.2d 542, Hutton contends that the trial court and the prosecutor erred in discussing mitigating factors on which Hutton had not presented evidence.

> Hutton correctly contends that such comment is inconsistent with *De Pew*. "If the defendant chooses to refrain from raising some of or all of the factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution. * * *

> "[I ]t is the defendant who has the right to present and argue the mitigating factors.  If he does not do so, no comment on any factors not raised by him is permissible."  38 Ohio St.3d at 289, 528 N.E.2d 542.

> Hutton claims that his appellate counsel rendered ineffective assistance by not raising the *De Pew* issue in the court of appeals.

*Hutton*, 100 Ohio St. 3d at 184, 797 N.E.2d at 957-58.  The court denied the claim.  First, it noted that the *DePew* case was decided after the court of appeals issued its decision on Hutton's first appeal, and attorneys are not expected "to anticipate a future decision or development in the law."  *Id.*, 797 N.E.2d at 958.  The court continued,

> Second, Hutton contends that, had counsel raised the *DePew* issue in the court of appeals, this court "would have had to reverse [his] death sentence."  On the contrary, we find it unlikely that a *DePew* claim would have succeeded.  We have never reversed a death sentence on the ground that the trial court gave the jury an instruction that neutrally listed all statutory mitigating factors, even though the list included factors on which the defense had not presented evidence or argument.  Such errors have consistently been held either harmless or not plain

error. . . .  Thus, no reasonable likelihood exists that Hutton would have prevailed on the *DePew* issue had his counsel raised it in *Hutton I.*

*Id*. (citations omitted).  The court's determination is not contrary to, or an unreasonable application, of *Strickland*.  This claim fails.

### b.    trial court's failure to define aggravating circumstances

Hutton also complains that his appellate counsel did not raise on direct review a claim challenging the trial court's failure to define aggravating circumstances.  As the Ohio Supreme Court explained,

> In the penalty phase, the trial court instructed the jury: "The prosecution has the burden to prove beyond a reasonable doubt that the aggravating circumstances, of which the Defendant was found guilty, outweigh the factors in mitigation * * * ."  The instructions further told the jury to recommend a death sentence "if you unanimously * * * find proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors."  However, the trial court neglected to inform the jury that the term "aggravating circumstances" meant the specifications of which Hutton had been found guilty in the guilt phase.  Defense counsel did not object to the instructions.
>
> Hutton's appellate counsel did not raise the issue of the trial court's failure to define "aggravating circumstances."

*Id*. at 184-85, 797 N.E.2d at 958.  The court found this claim lacked merit.  It found that because defense counsel did not object to the instructions at trial, any error was waived and the omission could not serve as the basis of reversal absent plain error.  Thus, it reasoned, "appellate counsel could reasonably decide not to try to raise it in the court of appeals," as the issue was not "clearly stronger" than the issues counsel did raise.  *Id*. at 185, 797 N.E.2d at 959 (citing *Jones v. Barnes*, 463 U.S. at 750-53; *Smith v. Robbins*, 528 U.S. 529 (2000)).

This Court agrees.  Moreover, in *Hoffner v. Bradshaw,* 622 F.3d 487 (6th Cir. 2010), the Sixth Circuit affirmed a district court ruling that reached the same result regarding an identical claim, expressly relying on the Ohio Supreme Court's ruling in *Hutton*.  *Id*. at 506.  The Sixth

Circuit agreed with the *Hutton* decision and added two additional grounds for denying the petitioner's ineffective-assistance-of-appellate-counsel claim.  First, it concluded that "the Ohio Supreme Court's reweighing of the mitigating and aggravating factors would effectively cure any error caused by an improper definition of 'aggravating circumstances.'"  *Id*. at 506 (citing *Slagle v. Bagley,* 457 F.3d 501, 521 (6th Cir. 2006)).  *See also Clemons v. Mississippi*, 494 U.S. 738, 748-50 (1990) (finding unconstitutionally overbroad jury instructions at the sentencing stage of capital case harmless error where state appellate court reweighed aggravating and mitigating evidence).  And second, the court reasoned that the petitioner could not show that, even if appellate counsel was deficient for not having raised the claim, the result of the trial would have been different.  *Hoffner*, 622 F.3d at 506.  It held that the trial court's omission was not a "structural" defect under *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991), which "affect 'the framework within which the trial proceeds' and are not simply errors in the trial process itself, . . . such as a faulty jury instruction is."  *Id*.

As the Sixth Circuit found in *Hoffner*, the Ohio court's resolution of this claim was not unreasonable, and this claim fails.

### c.      trial counsel's failure to object

For this sub-claim, Hutton argues that his appellate counsel should have raised on direct appeal a claim of ineffective assistance of trial counsel for failing to object to the improper jury instructions and prosecution comments described above.  The Ohio Supreme Court rejected this claim as well.  It found that because *DePew* had not been decided at the time of the trial, counsel could not be expected to object on that ground, and even if counsel had, the claim would not have been successful on appeal.  *Hutton,* 100 Ohio St. 3d at 186, 797 N.E.2d at 959.  As to the failure to object to the trial court's failure to define "aggravating factors," the court concluded

80

that the issue was not "'clearly stronger' . . . than the issues Hutton's appellate counsel actually

did present." *Id*. (citation omitted).  Again, the court's finding is not contrary to, or an

unreasonable application of, *Strickland*, and this claim is meritless.

### d.       issues omitted from cross-appeal

Hutton's final sub-claim is that his appellate counsel misread the court of appeals'

opinion, in which the three-judge panel was split on several issues, and therefore failed to raise

certain issues before the Ohio Supreme Court on direct appeal.  Those claims are:  sufficiency of

evidence, other acts evidence, improper limitation of cross-examination, prosecutorial

misconduct, and ineffective assistance of counsel in the penalty phase.  (ECF No. 66, 82-85.)

The Ohio Supreme Court rejected this claim, ruling,

> However, Hutton's appeal from the court of appeals to this court was not
> his first appeal, but his second.  "Having no constitutional right to counsel on a
> second appeal, [Hutton] had no constitutional right to the effective assistance of
> counsel."  *State v. Buell* (1994), 70 Ohio St. 3d 1211, 1212, 639 N.E.2d 110.

*Hutton*, 100 Ohio St. 3d at 186, 797 N.E.2d at 959.

Hutton argues that courts have misconstrued *Evitts v. Lucey* to apply only to "first

appeals of right," when it should apply to "any appeal of right that is created by the states."

(ECF No. 66, 82-83.)  Hutton offers no authority to support this proposition, however.  The Ohio

Supreme Court was correct.  The Supreme Court, and lower federal courts, consistently and

uniformly have recognized that *Evitts* limits ineffective-assistance-of-counsel claims to "first

appeals of right."  *See, e.g., Smith v. Robbins*, 528 U.S. 259, 276 (2000); *Goeke v. Branch*, 514

U.S. 115, 119 (1995); *Coleman v. Thompson*, 501 U.S. 722, 755-56 (1991); *Fautenberry v.

Mitchell*, 515 F.3d 614, 642 (6th Cir. 2008); *Freels v. Hills*, 843 F.2d 958, 959 (6th Cir. 1988).

The Ohio Supreme Court's decision, therefore, is neither contrary to, nor an unreasonable

81

application of, clearly established federal law.

**e.      conclusion**

Accordingly, each of Hutton's claims of ineffective assistance of appellate counsel is meritless, and this ground for relief is denied.

**C.      *Second Ground for Relief:  Suppression of Exculpatory Evidence***

For his second ground for relief, Hutton claims that prosecutors violated his constitutional rights when they failed to disclose numerous pieces of exculpatory evidence prior to trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, he alleges that the State failed to disclose six pieces of evidence:  inconsistent statements of Bernard Holloway and Simmons; impeaching material about Kim Lampkin; Bruce Laster's statements; and information Simmons Sr. possessed.

**1.      *Brady v. Maryland* and its progeny**

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  The Court has explained that this protection "will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'"  *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). As Justice Marshall wrote, "The message of *Brady* and its progeny is that a trial is not a mere 'sporting event'; it is a quest for truth in which the prosecutor, by virtue of his office, must seek truth even as he seeks victory."  *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986) (Marshall, J., dissenting).

82

In order to establish a *Brady* violation, a petitioner must satisfy the following three requirements:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The Supreme Court has held that *Brady* applies regardless of whether the defendant has expressly requested such evidence.  *Strickler*, 527 U.S. at 280.  In addition, courts have stressed that the inquiry must be objective, independent of the intent of the prosecutors.  *Brady*, 373 U.S. at 87; *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).  Finally, a showing of prejudice need not mean that the evidence would have led to an acquittal, but merely "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles*, 514 U.S. at 433-34.

### 2.      Procedural Posture

Hutton raised the Simmons Sr. sub-claim in his first post-conviction petition.  (App. to Return of Writ, vol. 11, 129-30.)  The court denied the claim on the basis of res judicata *(id.* at 215-16), and the Eighth District Court of Appeals affirmed on that ground.  *Hutton,* 2004 WL 1575248, at *1.  Hutton raised a related but different claim to the Laster sub-claim he now asserts in his second post-conviction petition.  (App. to Return of Writ, vol. 17, 22-24.)  The court denied the claim because it found the statement was not withheld from the defense.  (*Id*. at 266-67.)  The Court of Appeals affirmed that decision, but on the ground that the claim was not timely raised.  (ECF No. 34-1.)  Hutton did not raise the other sub-claims in state court.

Habeas petitioners must surmount several complex procedural hurdles before their *Brady* claims can be considered.  First, as explained above, a petitioner cannot obtain federal habeas

relief unless he has completely exhausted his available state court remedies to the state's highest court.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . .").  However, a habeas court need not wait for a petitioner's claims to be exhausted if it determines that a return to state court would be futile.  AEDPA § 2254(b)(1) provides that habeas relief may be granted on an unexhausted claim if "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B).  Respondent argues only that the Holloway sub-claim is exhausted. (ECF No. 64, 61.)  Hutton does not address exhaustion at all.

A second hurdle that Hutton must overcome before his *Brady* claims can be considered is 28 U.S.C. § 2254(e)(2), which generally governs habeas courts' ability to hold evidentiary hearings, but also applies to the introduction of new evidence without an evidentiary hearing, such as when the petitioner seeks to introduce new evidence based on a motion to expand the record.  *Holland v. Jackson*, 542 U.S. 649, 653 (2004).  Many of Hutton's *Brady* claims are based on new evidence, which he moved to have included in the record.  (ECF No. 49.)  This Court granted the motion, but reserved the right to exclude the evidence from its consideration when reaching the merits of Hutton's claims unless it first determined that Hutton had complied with the standards set forth in § 2254(e)(2).  (ECF No. 52.)  That Section provides that a habeas court may not expand the record and consider new evidence if a petitioner "failed to develop the factual basis of a claim in state court proceedings" unless the petitioner demonstrates: (1) the claim relies on a new rule of constitutional law made retroactive to him or the factual predicate of the claim could not have been previously discovered through the exercise of due diligence,

84

and (2) the facts underlying the claim establish, by clear and convincing evidence, that, but for the constitutional error, no reasonable jury would have found him guilty.  28 U.S.C. § 2254(e)(2)(A), (B).  Neither Hutton nor Respondent even mentions § 2254(e)(2).

Finally, Hutton must demonstrate that his *Brady* claims are not barred from habeas review due to procedural default.  Hutton raised only one of his *Brady* sub-claims in state court, the Simmons Sr. claim.  The remaining sub-claims, therefore, are procedurally defaulted. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Murray v. Carrier*, 477 U.S. 478 (1986); *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999) (all holding that failure to raise a constitutional issue at all on direct appeal constitutes procedural default).  The Simmons Sr. sub-claim also is procedurally defaulted, because the post-conviction court found it barred based on res judicata. Respondent argues only that the Holloway sub-claim is procedurally defaulted because it was never raised; she is silent as to the other sub-claims' procedural status.  (ECF No. 64, 61.)

To overcome this procedural bar, Hutton must either demonstrate that the state courts misapplied the procedural bar, or show cause and prejudice to excuse the default.  Hutton's position on these issues, however, is vague at best.  He notes that he raised "the issue" on post-conviction, but does not address the procedural status of his individual sub-claims.  (ECF No. 66, 10-11.)  He also asserts that "the issue" the post-conviction court found barred by res judicata "could not have been raised on direct appeal," and that the court of appeals was not explicit in its res judicata ruling.  (*Id.* at 10.)  The Court already has addressed and rejected these arguments.  *See supra* Section VI.A.1.b.  Finally, Hutton claims that he "could not have presented" the Holloway sub-claim to state court "as it had not been turned over to the defense."  (*Id.*)

The Court need not decide these procedural issues, however, since Hutton's *Brady*

85

claims have no merit.  *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").  Moreover, as the Supreme Court has noted, the cause and prejudice necessary to excuse procedural default can "parallel two of the three components of the alleged *Brady* violation itself," suppression and favorability.  *Strickler*, 527 U.S. at 282.  Because the Court determines that Hutton cannot satisfy these first two prongs of the *Brady* test, it follows that Hutton cannot demonstrate cause and prejudice for procedural default purposes.

### 3.    Suppression and Favorability Analysis

To meet *Brady*'s suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  A defendant should not be required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  Nevertheless, it is the defendant's duty to be vigilant in seeking exculpatory material.  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose."  *Coe,* 161 F.3d at 344 (internal quotation marks and citations omitted).

Evidence is considered to have exculpatory or impeachment value if it "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."  *Kyles*, 514 U.S. at 441.

Applying the above Supreme Court precedent, the Court will now address each of

86

Hutton's individual *Brady* claims, analyzing the exculpatory and suppression prongs of *Brady*.

The Court addresses the materiality requirement of *Brady*, cumulatively, below.  *See id.* at 436

n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no

other way.  We evaluate its cumulative effect for purposes of materiality separately . . . .").

Because the state courts never adjudicated these claims on the merits, this Court

reviews the claims de novo.  *See, e.g., Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007).

### a.        Bernard Holloway Statements

The first statement at issue is from Bernard Holloway ("Holloway"), who testified at trial

that Hutton had told him that Simmons and Mitchell had "hit" a numbers spot and that Sam was

shot, implying that Hutton fabricated a story to suggest how Mitchell had died.  (ECF No. 66,

12; App. to Return of Writ, Trial Tr., vol. 3, 1357-58.)  Hutton notes, however, that in two prior

statements to police (from September 30, 1985, and October 4, 1985), Holloway did not mention

Mitchell participating in numbers robberies.  Holloway testified at trial that he had spoken to the

police, but when defense counsel requested any statements from him from the prosecution, the

court told him there was none based on the prosecution's representation.  (App. to Return of

Writ, Trial Tr., vol. 3, 1359-60.)  Hutton claims that this evidence was suppressed and it is

favorable because it supports his argument at trial that Holloway made up the meeting with

Hutton.  (ECF No. 66, 12.)

Respondent counters that the Holloway statements were not suppressed because the fact

that Holloway spoke to police was in the record.  (ECF No. 64, 63.)  The Court does not agree.

Although Hutton's counsel was able to cross-examine Holloway at trial and was aware that

Holloway had spoken to police, he could not be expected to elicit from Holloway his exact

statements to the police months before the trial.  The prosecution represented to the trial court

that the State did not possess any statements from Holloway, and that simply was not true.  The Supreme Court has noted that "[t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of defense production request . . .," *Moore v. Illinois*, 408 U.S. 786, 794 (1972), and "any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." *Giles v. Maryland*, 386 U.S. 66, 96 (1967) (White, J., concurring).  The prosecution should have produced Holloway's statements to police when defense counsel requested them.  *See, e.g., United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (noting that "if the arguably exculpatory statements of witnesses discussed *supra* were in the prosecutor's file and not produced, failure to disclose indicates the 'tip of an iceberg' of evidence that should have been revealed under *Brady*").

The Court does not, however, find that the statements were favorable to Hutton.  Hutton could have used Holloway's prior inconsistent statements to impeach his credibility in accurately recounting what Hutton told him shortly after Mitchell disappeared.  But the inconsistency does not necessarily prove that Holloway made up the entire story of his meeting with Hutton.  The information would not have "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441.

### b.  Kimberly Lampkin Statement

The second piece of evidence at issue is a statement police took from Kimberly Lampkin ("Lampkin"), a close friend of Mitchell's and Simmons' and Holloway's roommate at the time of the murder.  (ECF No. 66, 14-15.)  Lampkin testified at trial that the Saturday before the shooting, she and Mitchell had given a sewing machine to someone.  Hutton came to her house the next day and spoke to Mitchell about looking for something.  (App. to Return of Writ, Trial

Tr., vol. 3, 1429.)  Lampkin also testified at trial that Holloway told her that Hutton was looking for her and that after she spoke to Holloway about Hutton she moved, implying that she felt threatened by what she learned about Hutton.  (*Id*. at 1398-99.)

According to Hutton, however, Lampkin told police on October 10, 1985, that she knew nothing about the sewing machine Sweeney informed police of, and that she did not even know Laster or Hutton, but this statement was never disclosed to defense counsel.  (ECF No. 66, 14; ECF No. 49-1, 74.)  In addition, Hutton claims that in Holloway's two statements to police, discussed above, Holloway did not mention any threat Hutton made concerning Lampkin.  (ECF No. 66, 14-15.)

Unlike the Holloway statements discussed above, Hutton does not demonstrate that his counsel ever requested statements of Lampkin from the prosecution.  They cannot, therefore, have been suppressed.  Moreover, even if Hutton had the statement in his possession at trial, it is not clear that the material would have made his case "markedly stronger."  Lampkin's blanket denial of any knowledge pertaining to the case suggests more that she was initially lying to police because she was reluctant to get involved in the investigation, than that she was fabricating her entire testimony at trial.

### c.    Simmons Statement

Simmons testified at trial that Hutton placed a rifle in his ribs and said, "I don't appreciate you all breaking in my sister's house.  Ain't nobody break into my sister's house." (App. to Return of Writ, Trial Tr., vol. 2, 960.)  Simmons told police on October 4, 1985, however, that it was Laster who pointed the rifle at him and told him he did not like anyone breaking into his sister's house.  (ECF No. 66, 16-17; ECF No. 49-1, 61-63.)  Hutton also notes that it is Laster who has a sister, and "[t]here is no evidence in the record other than this

89

testimony that Hutton even had a sister." (ECF No. 66, 17.)  Hutton claims that Simmons'

statement was suppressed because, although prosecutors gave defense counsel two written

statements of  Simmons' at trial, and defense counsel used those statements to show many

inconsistencies in Simmons' testimony, defense counsel never mentioned the material

inconsistency about who was holding the rifle and who spoke of a sister.  (*Id*. at 17; App. to

Return of Writ, Trial Tr., vol. 2, 999-1003.)  Hutton argues that "[m]inimally, the statement, if

believed, would establish that it was Laster and not Hutton who had a motive against Simmons.

It also may have been the proverbial straw that broke Simmons [*sic*] back of credibility."  (ECF

No. 66, 17.)

Hutton has not shown that this statement was either suppressed or favorable.  He has not

produced any evidence beyond speculation that the prosecution did not produce the statement at

issue.  This information also is not clearly favorable.  Hutton may be correct that the sister

referenced here is Celeste Laster, co-defendant Bruce Laster's sister and Hutton's fiancé, who

was going to live with Hutton in the house from which the sewing machine was stolen.  (*Id*.,

App. to Return of Writ, Trial Tr., vol. 3, 1886.)  But Hutton apparently forgets that he, too, has a

sister.  His older sister, Diane Banks, submitted one of the affidavits in support of Hutton's first

post-conviction petition.  (App. to Return of Writ, vol. 11, 88.)

### d.  Bruce Laster Statements

Hutton's co-defendant, Bruce Laster, did not testify at Hutton's trial.  According to

Hutton, Laster entered a guilty plea to involuntary manslaughter as part of a plea bargain two

days after the jury rendered its guilty verdict in Hutton's trial.  (ECF No. 66, 18.)  Hutton

claimed in his second post-conviction petition that, based on an interview that his counsel

conducted of Laster, he had evidence that Laster had made a statement to the police, which the

90

police had improperly withheld and which could have been used to impeach Simmons'

testimony and "absolve [him] of homicide." (App. to Return of Writ, vol. 17, 22-24.) The trial

court denied the *Brady* claim on the ground that Laster's statement was not suppressed. (*Id.* at

267.) The court of appeals affirmed on the ground that the petition was untimely, because

Hutton could not prove that the information was previously undiscoverable or that his claim had

merit. It explained,

> Hutton, however, has not shown that the State withheld evidence from him.
> According to Hutton's own petition and according to Laster's interview, Laster
> refused to cooperate with homicide detectives. Cleveland police reports reveal
> that Laster refused to provide police with a statement. Based on these factors, the
> State was not in possession of discoverable evidence.
>
> Hutton also contends Laster's testimony was not available until he agreed
> to come forward with the evidence and agreed to be interviewed by a private
> detective hired by Hutton. However, Hutton still waited to file his second
> petition based on this interview until almost a year and a half after the interview.
> The interview occurred on September 5, 1999, and Hutton filed his second
> petition on February 5, 2001.
>
> There is also evidence that Laster rejected previous attempts by Hutton to
> obtain his statement. Laster was incarcerated from 1985 until recently, therefore,
> Hutton was aware of Laster's whereabouts. There is no proof of his
> unavailability.

(ECF No. 34-1, 5-6.) The court also determined that "[t]he evidentiary value of this interview is

negligible."[18]  (*Id.* at 7.)

Here, Hutton asserts two, different *Brady* claims based on statements of Laster. First, he

points to Laster's statement during the interview that the detectives asked him to provide a

statement identifying Hutton as the perpetrator of the Mitchell and Simmons shootings, and he

---

[18]     The court found, "A review of Laster's interview reveals that Laster admitted he was
drunk the evening of the murders; was asleep in the car during the time the first victim was shot; and
was not present when the other victim was shot. He also admitted he does not know what happened
that night. Notably, he never stated that Hutton was innocent." (*Id.*)

refused because he "[didn't] know if Percy was guilty" and would not "lie and put a man in jail." (App. to Return of Writ, vol. 17, 57.)

Hutton's other *Brady* claim is based not on the Laster interview, but on a police report prepared on October 3, 1985, that does, in fact, summarize a brief oral statement Laster made to police. (ECF No. 66, 17-18; ECF No. 49-1, 58.)  Hutton argues that the statement conflicts with Sweeney's story.  The report indicates that Laster told police that he, Mitchell and Hutton waited for Sweeney for an hour while she was in the hospital visiting Simmons.  He stated Hutton and Mitchell then took him home, and he was not in the car when they picked up Sweeney from the hospital.  (ECF No. 66, 17; ECF No. 49-1, 58.)  Sweeney, on the other hand, testified that she came back to the car quickly to warn Mitchell but the car was gone, and that Laster and Hutton were in the car when Hutton picked her up from the hospital.  (App. to Return of Writ, Trial Tr., vol. 2, 1178.)  Hutton asserts that although "[t]he record is not clear if the defense was provided the oral summary for Laster," it must have been suppressed because counsel did not use it to impeach Sweeney.  (ECF No. 66, 18.)

The Court finds that these statements also were not suppressed.  Hutton had access to Laster and could have obtained this information before trial.  Moreover, the Court finds that the value of this information would not have "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."  *Kyles*, 514 U.S. at 441.  The fact that Laster would not sign a statement inculpating Hutton does not prove Hutton is innocent of the crime; it may just mean what Laster said; that he did not know if Hutton committed the crimes or not.  Similarly, it is just as likely that the jury would have considered Laster's account of his whereabouts after Mitchell was last seen as self-serving and of little impeachment value.

e.        **Simmons Sr. Statement**

92

Hutton's final *Brady* sub-claim is based on Simmons Sr.'s claim that three men came to his house the night Simmons was shot looking for his son.  (ECF No. 66, 7, 18.)  Hutton cites Simmons Sr.'s affidavit, in which he recounts this story and states that he told Detective Moore and Hutton's trial counsel about it.  (App. to Return of Writ, vol. 11, 76-77.)  Hutton argues that "this information would have provided evidence that [Simmons] was involved in a drug situation or any other type of situation that may have resulted in violence.  It was unquestioned that he and Ricky Mitchell were tight.  It should have surprised no one that the two [men] were [targeted] within the same time frame."  (ECF No. 66, 18.)

This material also does meet *Brady*'s suppression requirement.  Simmons Sr. avers that he told Hutton's attorney this information before trial.  Additionally, without any corroborating evidence, the story has minimal exculpatory or impeachment value.

### 4.    Materiality

Even if Hutton satisfied the first two *Brady* prongs, the Court would not find the information at issue material.  The Sixth Circuit has noted that "[p]rejudice (or materiality) in the *Brady* context is a difficult test to meet." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002).  In order to establish prejudice, "the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.  The *Brady* standard is not met, however, if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome; rather, a reasonable probability is required.  *Id.* at 291; *see also Kyles*, 514 U.S. at 434, and *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).  A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473

93

U.S. 667, 682 (1985).

The Supreme Court also has recently clarified that reviewing courts must consider the totality of the evidence–and not merely exculpatory facts in isolation–when evaluating a claim of error for its prejudicial effect.  In *Wong v. Belmontes*, 130 S. Ct. 383 (2009), the Supreme Court stated:

> In evaluating th[e] question [of prejudice], it is necessary to consider all the relevant evidence that the jury would have had before it if [the defense] had pursued [a] different path–not just the mitigation evidence [the defense] could have presented, but also the [other] evidence that almost certainly would have come in with it.

*Id*. at 386.

As explained above, the *Brady* material alleged here would have provided minimal value to Hutton.  Cumulatively, the materiality of the evidence is even weaker.  The Court cannot conclude that even if the evidence at issue were improperly withheld, its "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler*, 527 U.S. at 281.  This claim is not well-taken.

**D.**     ***Fifth and Seventh Grounds for Relief:  Prosecutorial Misconduct***

For his fifth and seventh grounds for relief, Hutton alleges further prosecutorial misconduct rendered his trial fundamentally unfair, namely, that the prosecution:  1) questioned Mrs. Pollard during redirect examination about Hutton's prior manslaughter charge, among other things; and 2) read Hutton's arrest record to the jury during closing argument in the penalty phase of trial, arguing that Hutton had repeatedly avoided conviction.  Hutton objects to the prosecutor specifically listing for the jury, and commenting upon, the thirteen offenses with which Hutton had been charged in the past, when only two of the charges, armed robbery and voluntary manslaughter, resulted in convictions, and the manslaughter conviction was reversed

94

on appeal.  (ECF No. 60, 30-35; ECF No. 66, 50, 56-61.)  As the Ohio Supreme Court

summarized,

> The prosecutor devoted a large part of his [penalty-phase closing] argument to Hutton's criminal record as it appeared in the PSI.  He read each item to the jury.  Discussing the first two charges on Hutton's record, he said, "Both times he was released.  Caught a couple of breaks."  Discussing another charge, he said: "Again he gets a release * * *.  How many times do they have to pat this guy on the back?"

> The prosecutor also said:

> "He is found guilty in '78 of voluntary manslaughter, felonious assault, weapons disability and abduction.  Sentenced again. * * * He appeals the conviction and everything except for the weapons disability charge is reversed by the Court of Appeals and there is no further prosecution.  He gets paroled again."

*Hutton*, 53 Ohio St. 3d at 43, 559 N.E.2d at 441.

### 1.    Procedural Posture

Respondent contends that Hutton's prosecutorial-misconduct claims are procedurally

defaulted because defense counsel did not object to the complained-of comments.  (ECF No. 64,

75-76, 82.)  Hutton raised the claims on direct appeal to the Eighth District Court of Appeals.

That court agreed with Hutton, holding that the prosecutor's remarks "during trial, closing

argument and at the penalty phase greatly harmed the appellant's substantial right to a fair trial,"

because "it is impermissible to reveal to the jury the existence of offenses for which the

defendant has not been convicted."  *Hutton*, 1988 WL 39276, at **27-28.

The Ohio Supreme Court, however, reversed the court of appeals' decision on this claim.

Because of defense counsel's failure to object, the court reviewed the claim under a plain error

analysis, and found it lacked merit.  It agreed with the court of appeals that "the prosecutor erred

in telling the jury that the prior convictions had been reversed," because there was no evidence

in the PSI or elsewhere in the record of the reversals.  *Hutton*, 53 Ohio St. 3d at 43, 559 N.E.2d

95

at 442.  The court further found that the prosecutor's statements were "potentially prejudicial."

*Id*. at 44.  It explained,

> By emphasizing the "breaks" Hutton received, the prosecutor apparently sought to suggest that Hutton had committed crimes and gotten away with them. Such argument could have distracted the jury from its proper task: deciding what punishment Hutton deserved for murdering Mitchell.  After hearing about the crimes Hutton had supposedly gotten away with, the jury may have wanted to punish him for those crimes as well.

*Id*.  But the court concluded that "[g]iven the sparseness of the mitigating evidence, we cannot say that it is *clear* that the outcome of the penalty phase would have been different but for the unobjected-to statements."  *Id*.

Hutton concedes that the claim of prosecutorial misconduct that occurred during the guilt phase of trial is procedurally defaulted, and appears to abandon the claim.  (ECF No. 66, 50.) As to his claim regarding the prosecutor's penalty-phase closing argument, Hutton argues that the procedural default is excused by the ineffective assistance of trial counsel in failing to object. (*Id*. at 59.)  This Court has found this ineffective-assistance claim meritless, however, *see supra* Section VI.A.2.c.v., and it therefore cannot overcome the bar to Hutton's prosecutorial-misconduct claim.  These claims are procedurally defaulted.

### 2.    Merits

Even if Hutton's prosecutorial-misconduct claims were ripe for review, they lack merit. The Supreme Court has held that a prosecutor "may prosecute with earnestness and vigor . . . But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  The prosecution, therefore, must avoid insinuations and assertions that are calculated to

mislead the jury.  *Id.*

To assert a successful claim for prosecutorial misconduct in a habeas proceeding, a prosecutor's conduct must be "so egregious as to render the petitioner's trial fundamentally unfair."  *Buell v. Mitchell*, 274 F.3d 337, 364 (6th Cir. 2001).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007).  The Sixth Circuit has stressed the narrow scope of a habeas court's review of this due process claim, stating, "We do not possess supervisory powers over state court trials."  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  "[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority."  *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979).

This Court finds that the Ohio Supreme Court's decision rejecting Hutton's prosecutorial-misconduct claims is reasonable.  The Court already has found the admission of the PSI to be permissible, and therefore trial counsel's failure to object to it cannot provide the basis for an ineffective-assistance claim.  Likewise, a prosecutor's reference to it cannot form the basis of a prosecutorial-misconduct claim.  *See supra* Section VI.A.2.c.v.

### E.  Fourth Ground for Relief:  Sufficiency of the Evidence

Hutton's fourth ground for relief is that there was insufficient evidence to support his convictions for aggravated murder and kidnapping.  (ECF No. 60, 27-29; ECF No. 66, 36-49.)  Hutton was charged with two counts of aggravated murder.  The first count required a finding that Hutton caused Mitchell's death with "prior calculation and design."   Ohio Rev. Code

97

§ 2903.01(A).  The other count required a finding that Hutton committed the murder "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping . . . ."  Ohio Rev. Code § 2903.01(B).  Both counts included two capital murder specifications:  one requiring the jury to find that the murder "was part of a course of conduct" in which Hutton purposely killed Mitchell and also purposely attempted to kill Simmons; the other requiring it to find that Hutton "either . . . was the principal offender in the commission of the aggravated murder, or, if not the principal offender, committed the aggravated murder with prior calculation and design."  Ohio Rev. Code § 2929.04(A)(5) and (7), respectively.

Hutton argues that the evidence did not demonstrate his prior calculation and design in Mitchell's murder or the kidnapping.  Specifically, he claims "the state could not establish the time of death, the weapon or weapons used to cause the death, or the circumstances of the death."  (ECF No. 66, 45.)  He points to the prosecution's lack of "direct witnesses" and its reliance on the "incredulous testimony" of its "sole witness," Simmons.  (*Id*. at 39, 44-45.)  He also notes the lack of "physical evidence linking [Hutton] to any wrong doing [*sic*] that day," such as a conclusive murder weapon, a report of an attempted robbery of an Eldorado car in the area near Wain Court and East 103rd St. the night Simmons was shot, or even confirmation that the car existed, a report from the person who found Mitchell's body, or any incriminating evidence found in the car Hutton drove that night or in his apartment.  (*Id*. at 39.)

### 1.    Procedural Posture

Respondent argues that this claim is procedurally defaulted.  (ECF No. 64, 73.)  Hutton raised this claim on direct appeal to the Eighth District Court of Appeals when he challenged the trial court's denial of Hutton's motions for acquittal.  (App. to Return of Writ, vol. 3, 51-55.)

98

Judge Matia, who wrote the lead opinion for the three-judge panel, concluded that the trial court erred in not granting Hutton's motions for acquittal on the charges for the kidnapping and aggravated murder of Mitchell.  *Hutton*, 1988 WL 39276, at *12.  Judge McManamon concurred with Judge Matia on some grounds, but explicitly disagreed with his decision on the sufficiency-of-the-evidence claim.  *Id*. at **39-40.  The third judge, Judge Patton, was silent as to this claim in his dissent, but affirmed Hutton's conviction and sentence.  *Id*. at *49.  Hutton did not, however, raise this issue on cross-appeal to the Ohio Supreme Court.[19]  This claim, therefore, is procedurally defaulted.  *O'Sullivan*, 526 U.S. at 847-48.

Hutton asserts that the procedural default of this claim was "forgiven" when the court of appeals granted his *Murnahan* motion, in which he asserted a claim of ineffective assistance of appellate counsel for failing to raise the sufficiency-of-the-evidence claim.  (ECF No. 66, 37.) The Sixth Circuit has rejected this argument.  It explained in *Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001), "[T]hat a court, in reviewing a claim of ineffective assistance of counsel, looks to the merits of the alleged error for purposes of determining the existence of *Strickland* prejudice is not dispositive of the question whether a procedurally defaulted claim has been resurrected."  *Id*. at 612.

###  2.      Merits

Even if this claim were ripe for review, it is without merit.  The Fourteenth Amendment requires the State to prove every element of a crime beyond a reasonable doubt.  *Jackson v.*

---

[19]      The court noted that Hutton did not appeal this issue.  *Hutton*, 53 Ohio St. 3d at 44, 559 N.E.2d at 442.  Nevertheless, it "conclude[d] that the majority of the court of appeals decided [the claim] correctly in the state's favor, [and its review of the claim] would not affect [the court's] disposition of this appeal in any event."  *Id*.

*Virginia*, 443 U.S. 307, 315-16 (1979).  When reviewing claims of insufficient evidence, habeas courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*. at 319 (emphasis original).  "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins,* 506 U.S. 390, 402 (1993).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.

This Court must limit its review to evidence adduced during trial.  *Herrera,* 506 U.S. at 402 (citing *Jackson*, 443 U.S. at 318) ("*Jackson* does not extend to nonrecord evidence, including newly discovered evidence.").  And it is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16.

Because both *Jackson* and AEDPA apply to Hutton's sufficiency claim, this Court's review requires deference at two levels.  "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEPDA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer,* 541 F.3d 652, 656 (6th Cir. 2008)).  The Sixth Circuit has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'"  *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Judge McManamon provided the last reasoned state-court determination of this matter in

100

her concurring opinion for the Eighth District Court of Appeals.  She concluded,

> I believe the state presented sufficient evidence to support both the kidnapping and murder counts.  Approximately one week before the evening at issue, Hutton told Mitchell and Simmons he would kill them both if he learned they stole the sewing machine.  A jury could reasonably find this motive compelled Hutton to shoot Simmons.  The expert ballistics testimony showed it was possible that Mitchell and Simmons were shot with the same gun.  Before shooting Simmons, Hutton had held a gun to Mitchell's head when they stopped at the bus lot.  Mitchell was last seen alive when he left the hospital with Hutton, who later told Eileen Sweeney that Mitchell "wasn't coming back."
>
> A reviewing court will not reverse a conviction on sufficiency grounds if the evidence would permit reasonable minds to differ as to whether the state proved each element of the offense beyond a reasonable doubt. . . .
>
> The state theorized at trial that Hutton kidnapped Mitchell by deception to facilitate his murder.  (Tr. 2142, 2280).  See R.C. 2905(A)(2).  Conversely, one of Hutton's aggravated murder convictions, charged in the second count of the indictment, is felony murder based on the kidnapping.
>
> The evidence reasonably permits a finding of kidnapping by deception.  Simmons testified that Hutton told Mitchell on the way to the hospital that someone came out of the house and shot Simmons.  (Tr. 973-974).  When Mitchell left the hospital with Hutton and Laster, he believed that they were on their way to "get" the person who shot Simmons.  (Tr. 974-975).  The jury could reasonably have found Hutton instilled Mitchell's belief, and that, consistent with the preceding events that evening, Hutton instead intended to kill him.
>
> In addition to felony murder, Hutton was convicted of aggravated murder, as charged in the first count of the indictment, under a theory of prior calculation and design.  See R.C. 2903.01(A).  The same evidence outlined above supports a finding that Hutton killed Mitchell with "some kind of studied analysis with its object being the means by which to kill." . . .  I would thus affirm the court's ruling under this theory as well.

*Hutton*, 1988 WL 39276, at *40 (citations omitted).[20]

---

[20]     Judge Matia, on the other hand, focused on the missing evidence.  He opined,
A review of the case *sub judice* clearly reveals that the evidence at the close of the state's case was entirely lacking in proof, either direct or circumstantial, as to several vital elements of the offenses of aggravated murder as charged in the indictment.  Specifically, the record reveals that:
1) there was no evidence before the trial court as to the circumstances, time,

The Ohio Supreme Court, in reviewing Hutton's claim that the trial court committed error by admitting Eileen Sweeney's testimony that Hutton raped her, also found the evidence of Hutton's guilt "overwhelming."  *Hutton*, 53 Ohio St. 3d at 40-41, 559 N.E.2d at 439-40.  The court characterized the evidence supporting Hutton's murder and kidnapping convictions this way:

> The evidence in this case points ineluctably to Hutton as the murderer of Derek Mitchell.  Hutton had a strong motive: revenge for the theft of the sewing machine and the money hidden therein.  Hutton claimed to have been told by Evans that Mitchell had tried to sell Evans a sewing machine.  Hutton accused Mitchell of "breaking in my sister's house."  In response to Hutton's demands, Mitchell actually produced a sewing machine, which he turned over to Hutton.  Finally, Hutton carried out his threat to shoot Simmons.  On this record, it is clear that Hutton believed that Mitchell and Simmons stole his machine.

> Hutton attempted to kill Simmons with a .22 caliber revolver.  He also had a .22 caliber rifle in his car.  Mitchell was killed with a .22 caliber weapon.  Expert testimony established that Simmons could have been shot with the same gun.  Eileen Sweeney corroborated Simmons's description of Hutton's pistol.  Mitchell's corpse was found with a tire lying on it–a significant fact in light of the evidence that Hutton believed that Mitchell had stolen tires from him.

> Hutton told Eileen Sweeney that "Ricky wasn't coming back," and she should "forget about him."  These statements clearly show that Hutton knew Mitchell was dead.  He later informed her that "if * * * [she] told[,] someone would be looking for * * * [her]."  This threat indicates consciousness of guilt.

---

> or place of Mitchell's death;
> 2) there was no evidence before the trial court that Mitchell met his death while in the company of the appellant during the morning of September 16, 1985;
> 3) the coroner could only provide an approximation of the time of Mitchell's death;
> 4) there was evidence of a vague conditional threat made by the appellant toward Mitchell and the display of a handgun which could have possibly indicated hostility between the appellant and Mitchell; and
> 5) there was evidence that the appellant made a number of statements to the effect that "Ricky wasn't coming back."  However, such statements could hardly be considered as an admission of murder.

*Id*. at *13.

102

Events confirmed Hutton's statement that Mitchell "wasn't coming back." Eileen Sweeney, Mitchell's alleged common-law wife, never saw Mitchell again after he left her at the hospital.  This was unusual, since Sweeney testified that, during their three-year cohabitation, Mitchell "[v]ery seldom" failed to spend the night at their apartment and never left home without telling her.

The evidence that the murder was committed with prior calculation and design is, if anything, stronger.  Mitchell was shot at least twice, once in the head and once in the chest. . . .  When this is added to Hutton's repeated threats against Mitchell's life, a rational trier of fact could hardly fail to find prior calculation and design.

Finally, the evidence of kidnapping was overwhelming.  Simmons's testimony showed that Hutton shot Simmons and falsely told Mitchell that someone else had done it.  At the hospital, Mitchell said, in Hutton's presence, "* * * [W]e going to get the * * * [person] who did this to you."  While there is not evidence that Hutton affirmatively caused Mitchell to believe that they were about to hunt down Simmons's fictitious assailant, Hutton knew that Mitchell believed they were.  Instead of correcting this belief, Hutton took advantage of it to lead Mitchell to his death.  This constituted kidnapping by deception under R.C. 2905.01(A).

*Id*. at 41, 559 N.E.2d at 439-40 (citations omitted).

Hutton is correct that there was little direct, physical evidence to support his convictions. Nevertheless, courts repeatedly have ruled that "[c]ircumstantial evidence alone, if 'substantial and competent,' may support a verdict and need not 'remove every reasonable hypothesis except that of guilt.'"  *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996) (quoting *United States v. Stone,* 748 F.2d 361, 363 (6th Cir. 1984)).  *See also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction. . . ."); *Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence. . . .  In both, the jury must use its experience with people and events in weighing the probabilities."); *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) ("[P]hysical evidence is not a prerequisite to sustaining a conviction.").  The state court provided a detailed, compelling

summary of the evidence, albeit circumstantial, against Hutton.

Hutton also contests the credibility and strength of Simmons' testimony.  This Court, however, may "not reweigh the evidence nor make assessments of witness credibility."  *Pinchon v. Myers*, 615 F.3d 631, 644 (6th Cir. 2010).  Moreover, contrary to Hutton's assertion, Simmons was not the State's "sole witness."  The State presented numerous other witnesses, including Eileen Sweeney, Bernard Holloway, Kimberly Lampkin, Mary Pollard and the hospital security guards, who corroborated key aspects of Simmons' testimony.[21]

Hutton has not shown that the jury's verdict was unreasonable in light of the evidence adduced at trial.  Nor has Hutton demonstrated that the state court's conclusion that the evidence was sufficient was contrary to, or an unreasonable application of, *Jackson*.  Given the strong circumstantial evidence that Hutton committed the murder and kidnapping, at least one "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This claim, therefore, fails.

**F.**     ***Sixth Ground for Relief:  Trial Court Error in Admitting Rape Evidence***

Hutton claims for this sixth ground for relief that the trial court erred by admitting Eileen Sweeney's testimony that Hutton raped her, of which he was later acquitted and which he argues was unduly prejudicial.  (ECF No. 66, 51-56.)  The Ohio Supreme Court found that the

---

[21]     For example, Eileen Sweeney corroborated Simmons' description of Hutton's pistol. (App. to Return of Writ, Trial Tr., vol. 2, 1184.)  Bernard Holloway and Kimberly Lampkin verified that Hutton was angry at Mitchell and Simmons about, and searching for, the sewing machine the day before Mitchell was last seen.  (*Id*. at vol. 3, 1347-48, 1391, 1393, 1410.)  In fact, Lampkin testified that she and Mitchell had "dropp[ed] off" a sewing machine to someone that day.  (*Id*. at 1429.)  Mary Pollard confirmed Simmons' account of what occurred at her house after Simmons had been shot.  (*Id*. at 1876-77.)  And the hospital security guards corroborated Simmons' testimony that Hutton had dropped him off at the hospital after he was shot and returned later with Sweeney, and that Hutton had threatened him while he was in the hospital.  (*Id*. at 1524-25, 1532, 1551-52.)

admission of this evidence constituted error, but held that the error was harmless and therefore not reversible.  *Hutton*, 53 Ohio St. 3d at 39-41, 559 N.E.2d at 438-40.  Hutton contends that the court "used an improper standard to determine the error to be harmless."  (ECF No. 66, 51.)

### 1.  Procedural Posture

Hutton raised this claim on direct appeal.  The Eighth District Court of Appeals held that Eileen Sweeney's testimony about the rape was inadmissible and found reversible error.  *Hutton*, 1988 WL 39276, at **20-22, 32-34.  The Ohio Supreme Court reversed.  It, too, found the evidence inadmissible under Rule 404(B) of the Ohio Rules of Evidence, because "the rape was neither 'inextricably intertwined' with the murder, nor relevant for any purpose."  *Hutton*, 53 Ohio St. 3d at 40, 559 N.E.2d at 439.  But it found the error harmless given the strength of the evidence against Hutton, as described above.  *Id*. at 41, 559 N.E.2d at 439-40; *see supra* Section VI.E.2.

Hutton also raised this claim in his first post-conviction petition, submitting to the trial court the journal entry showing his acquittal of the rape charge.  (App. to Return of Writ, vol. 11, 130-31, 47.)  The post-conviction court denied the claim.  It stated,

> The Ohio Supreme Court fully examined every aspect of this issue and found that the statements made by Sweeney were proper in order to show the logical order of the evening's events.  Moreover, an instruction was given to the jury so that they would use this evidence properly.  Since this issue was already raised on direct appeal, it is *res judicata*.

(*Id*. at 217.)  The court's decision was upheld by the Eighth District Court of Appeals on the ground of res judicata.  *Hutton*, 2004 WL 1575248, at *1.  This claim is preserved for federal habeas review.

### 2.  Merits

"[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497

U.S. 764, 780 (1990).  *See also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").  Generally, therefore, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review."  *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).  Hutton, however, asserts that the trial court's admission of Eileen Sweeney's testimony about the rape violated his constitutional right to due process.  (ECF No. 66, 55.)  Evidentiary rulings made by state courts may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

Thus, the Supreme Court has held that habeas petitioners may be entitled to relief based on a constitutional error at trial if "they can establish that it resulted in 'actual prejudice.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (challenging the trial court's admission of evidence, for impeachment purposes, of defendant's post-*Miranda* silence).  Actual prejudice is present when the error had "substantial and injurious effect or influence in determining the jury's verdict."  *Id*. at 623.  "The proper standard by which to gauge the injurious impact of the admission of constitutionally infirm evidence is to consider the evidence before the jury absent the constitutionally infirm evidence."  *Brumley v. Wingard*, 269 F.3d 629, 646 (6th Cir. 2001) (citing *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999) (holding admission of taped confession of witness invoking Fifth Amendment privilege to be harmless error on the basis of the other evidence admitted at trial), and *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993) (rejecting argument that the admission of the videotaped testimony of available key witnesses was harmless error by examining the rest of the trial record)).

106

Respondent does not dispute that the trial court erred in allowing Eileen Sweeney to testify that Hutton raped her.  (ECF No. 64, 79-82.)  Instead, she argues that Hutton "fails to address how [the harmless-error] standard was improperly applied and how this decision was prejudicial.  Hutton merely attacks the merits of the testimony."  (*Id.* at 79.)  The Court agrees.  Hutton has not explained how the Ohio Supreme Court "used an improper standard to determine the error to be harmless."  The court did exactly what is required for a harmless-error analysis under *Brecht*:  it examined the "other admissible evidence, standing alone," and found it to "constitute[] overwhelming proof of guilt."  *Hutton*, 53 Ohio St. 3d at 41, 559 N.E.2d at 439.

Nor has Hutton demonstrated that the state court was unreasonable in its determination that the trial court's error was harmless given the substantial evidence supporting Hutton's murder and kidnapping convictions.[22]  The only argument that he offers to support his claim is that "the introduction of such inflammatory evidence, of which Hutton was later exonerated in a

---

[22]     Hutton further argues that AEDPA deference does not apply to this claim, and the Court should review it de novo.  (ECF No. 66, 51.)  He contends that because Hutton's acquittal on the rape charges was not part of the record before the Ohio Supreme Court, and the court therefore did not consider the acquittal in its determination of harmless error, the court did not adjudicate the merits of this claim.  This argument is not well-taken.  First, Hutton cites two cases as support for this proposition, *Williams v. Anderson,* 460 F.3d 789, 804 (6th Cir. 2006), and *Dickerson v. Bagley,* 453 F.3d 690, 698 (6th Cir. 2006).  Neither applies.  Second, to the extent that Hutton is arguing that this claim is a new or different claim than the claim raised on direct appeal, his position is problematic.  It contradicts his representation that he raised this claim on direct appeal, and it is therefore preserved for habeas appeal.  (ECF No. 66, 51.)  It also would result in the new claim being unexhausted and procedurally defaulted based on the post-conviction court's finding of res judicata.  Finally, the Supreme Court has declined to decide "where to draw the line between new claims and claims adjudicated on the merits" for purposes of AEDPA review.  *Pinholster,* 131 S. Ct. at 1401 n.10.  In this case, the state court found the admission of the evidence at issue to be error.  The fact that Hutton was later acquitted confirms the risk–and prejudice–of admitting this type of evidence, but it does not change the harmless-error calculus performed by the court.  Regardless, Hutton's claim regarding the admission of the rape evidence would fail even were the Court to review it de novo.

separate trial, created an impermissible risk that the jury would not be mindful of the instruction, particularly since it was removed in time from the testimony it referenced."  (ECF No. 66, 55-56.)  Without more, Hutton cannot show that the trial court's error had a "substantial and injurious effect" on the jury's verdict.  This claim is meritless.

  **G.**  *Eighth Ground for Relief: Trial Court's Failure to Define Aggravating Factor*

  Hutton asserts in his eighth ground for relief that the trial court erred in failing to define the term "aggravating factor" for the jury before its penalty-phase deliberations, leaving the jury "without guidance in determining the factors to be considered when deciding the appropriateness of the death penalty in this case."  (ECF No. 66, 62.)

    **1.**  **Procedural Posture**

  Respondent claims that this claim is procedurally defaulted because Hutton did not raise it on direct appeal.  (ECF No. 64, 83.)  Hutton concedes that the claim is defaulted, but he argues that the bar is excused by his appellate counsel's failure to raise the claim.  (ECF No. 66, 62.)  As explained above, this Court finds Hutton's ineffective-assistance claim based on this ground to be meritless, and it therefore cannot be used as cause for the underlying defaulted claim.  *See supra* Section VI.B.2.b.  The claim is procedurally defaulted.

    **2.**  **Merits**

  Even if this claim were not barred from habeas review, it is meritless.  The Sixth Circuit has explained, "To warrant habeas relief because of incorrect jury instructions, [a petitioner] must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair."  *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).  "When a court makes an error in instructing the jury, the proper inquiry is 'whether there is a reasonable likelihood that the jury' applied the instruction

'in an unconstitutional manner.'"  *Doan v. Carter*, 548 F.3d 449, 455 (6th Cir. 2008) (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)).

As explained above, the Sixth Circuit addressed the identical alleged trial court error in the context of an ineffective-assistance-of-appellate counsel claim in *Hoffner v. Bradshaw,* 622 F.3d 487, 505-06 (6th Cir. 2010).  *See supra* Section VI.B.2.b.  It held that even if the trial court committed an error by failing to define "aggravating circumstances," that error was "effectively cure[d]" by the Ohio Supreme Court's reweighing of the mitigating and aggravating circumstances.  *Id*. at 506 (citing *Slagle v. Bagley,* 457 F.3d 501, 521 (6th Cir. 2006)).  *See also Clemons v. Mississippi*, 494 U.S. 738, 748-50 (1990) (finding unconstitutionally overbroad jury instructions at the sentencing stage of capital case harmless error where state appellate court reweighed aggravating and mitigating evidence).  It further held that even if appellate counsel were deficient for not having raised this claim, the result of the appeal would not have been different, because the trial court's omission was not a "structural" defect under *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991), which "affect 'the framework within which the trial proceeds' and are not simply errors in the trial process itself, . . . such as a faulty jury instruction is."  *Hoffner*, 622 F.3d at 506.

The court's reasoning in *Hoffner* applies here.  Even if the trial court committed error by failing to define the term "aggravating circumstances" in the sentencing jury instructions, the error was cured by the court of appeals' reweighing of mitigating and aggravating circumstances, which was then affirmed by the Ohio Supreme Court.  *Hutton*, 72 Ohio App. 3d at 351-52, 594 N.E.2d at 694-95; *Hutton*, 100 Ohio St. 3d at 187-91, 797 N.E.2d at 960-63.  Moreover, as the Sixth Circuit held, this omission in the trial court's jury instructions was not a "structural" defect, and therefore did not subvert the jury's role in deciding Hutton's sentence

109

and "render[] the entire trial fundamentally unfair."  The Ohio Supreme Court's decision on this claim was not unreasonable.  This claim is meritless.

**H.**     *Ninth Ground for Relief:  No Sympathy Instruction*

Hutton argues for his ninth ground for relief, "The trial court improperly instructed the jury during the penalty phase of trial not to consider any sympathy in its determination of the appropriateness of the death penalty."  (ECF No. 66, 69-70.)  Hutton identifies the instruction at issue as:  "You must not be influenced by any consideration of sympathy or prejudice."  (App. to Return of Writ, Trial Tr., vol. 4, 2318.)

**1.     Procedural Posture**

Hutton raised this precise claim on direct appeal to the Ohio Supreme Court, and it is preserved for habeas review.[23]

**2.     Merits**

In deciding this issue, the Ohio Supreme Court first observed that it already had approved the instruction to which the contested language belonged in a prior case.  *Hutton*, 53 Ohio St. 3d at 49, 559 N.E.2d at 447.  The court continued, "More important, the instruction was not even given in the penalty phase.  Contrary to Hutton's contention, it was given only in the guilt phase, where it was incontestably proper."  *Id.*

Apparently, Hutton has repeated his mistake in this Court.  The jury instruction of which he complains was given in the guilt phase of Hutton's trial, not the penalty phase as he contends.  But even if it were given during the penalty phase, it would be permissible.  In *California v.*

---

[23]     In that appeal, Hutton asserted the following proposition of law: "During the penalty phase, the trial court may not instruct the jury to exclude consideration of sympathy.  This instruction is violative of the Eighth and Fourteenth amendments of the United States Constitution." (App. to Return of Writ, vol. 6, 3.)

110

*Brown*, 479 U.S. 538 (1987), the Supreme Court rejected a capital defendant's argument that an instruction preventing the jury from being swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was unconstitutional.  *Id*. at 542.  The Court held, "Even a juror who insisted on focusing on [the phrase 'mere sympathy'] in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase."  *Id*.  Moreover, the Sixth Circuit has held that the *identical* jury instruction given during the penalty phase of a capital trial was constitutional under *Brown*.  *Greer v. Mitchell,* 264 F.3d 663, 688 (6th Cir. 2001) (court told jury during sentencing instructions, "You must not be influenced by any consideration of sympathy or prejudice").  Hutton's claim lacks merit.

  **I.**  ***Tenth Ground for Relief:  Improper Dismissal of Juror***

  After the jury returned Hutton's verdict, and before the penalty phase of the trial began, the court excused a juror who was visibly upset and replaced her with an alternate juror.  The court then conducted this brief colloquy with the new juror:

> The Court:  Mr. Phiel, you did sit and participate in this trial during the guilt phase, did you not, sir?
>
> Mr. Phiel:  Yes, I did.
>
> The Court: And you participated up to the point of the Jury withdrawing to deliberate; is that right?
>
> Mr. Phiel:  Yes.
>
> The Court:  Now, sir, the question before us has to do with the Jury's verdict in the case as it returned this verdict.  I will ask you, will you as an alternate – as a juror, a regular panelist who must now consider the punishment phase, do you adopt the conclusions of the regular panel, including [the excused juror], which was returned to the Court on the 29th day of January, 1986?
>
> Mr. Phiel:  Yes.

111

The Court:  Are you now, sir, prepared to proceed with the panel to dispose of the remaining considerations in this case which the Court has before it this afternoon?

Mr. Phiel:  Yes.

(App. to Return of Writ, Trial Tr., vol. 4, 2373-74.)

Hutton contends for his tenth ground for relief that the trial court improperly dismissed the juror from the penalty phase of the deliberations and allowed the alternate juror, who had not deliberated in the guilt-phase deliberations, to deliberate regarding sentencing.  He further argues that the trial court "erroneously instructed the alternate juror to adopt the findings of the remaining jurors, thereby depriving Hutton of his right to have all jurors make their own individual finding of the appropriateness of the death penalty."  (ECF No. 66, 70-77.)

### 1.	Procedural Posture

This claim is ripe for review.  Hutton raised it on direct appeal to the Eighth District Court of Appeals and to the Ohio Supreme Court, both of which denied the claim.  *Hutton*, 1988 WL 39276, at **15-18; *Hutton*, 53 Ohio St. 3d at 44-48, 559 N.E.2d at 442-45.

### 2.	Merits

Hutton identifies two constitutional violations underlying this claim.  First, he argues that the trial court's "erroneous exclusion of a sitting juror" violated his Sixth Amendment right to an impartial jury under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and its progeny, which govern when prospective jurors who oppose the death penalty may or may not be excused for cause.  (ECF No. 61, 38-39.)  But *Witherspoon* does not apply here.  This claim concerns the dismissal and substitution of a juror who was excused for personal reasons having nothing to do with her views of the death penalty.  Hutton does not challenge the selection of the alternate juror on *Witherspoon* grounds, and his participation in the jury does not render the jury

112

impartial.

Hutton further claims that the trial court's instruction to the alternate juror violated the constitutional rule established in *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988), in which the Supreme Court held that the sentencing judge or jury may not refuse to consider, or be precluded from considering, "any relevant mitigating evidence."  Hutton argues that because the alternate juror was instructed to accept the findings of his fellow jurors from the guilt phase of trial, if the other jurors did not consider mitigating evidence introduced during that phase of the trial, then "the trial court's instruction improperly prevented a juror from considering valid mitigation." (ECF No. 66, 76-77.)  Hutton's argument is not well-taken.  The instruction at issue advised the alternate only to adopt the jury's previous findings regarding *guilt*; it did not restrict the new juror from considering any *mitigating circumstances* he may have heard during the guilt phase in any manner whatsoever.

Furthermore, the Ohio Supreme Court directly addressed the constitutional implications of Hutton's claim when it discussed whether the trial court's instruction violated Ohio's statutory right to have a penalty recommendation made by the "trial jury."  It observed,

> Our interpretation [of the Ohio statute] is consistent with the reasons for using "the trial jury" to recommend the sentence.  In *Lockhart v. McCree* (1986), 476 U.S. 162, the United States Supreme Court, holding that using the same jury in both phases is constitutional, identified two legitimate state interests in that practice.  First, a capital defendant "might benefit at the sentencing phase * * * from the jury's 'residual doubts' about the evidence presented at the guilt phase. * * * " *Id*. at 181, 106 S. Ct at 1769.  Second, "in most, if not all, capital cases much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase * * * ."  *Id*.

> Alternate jurors are selected in the same way as regular jurors and hear the same evidence.  Since they see and hear the trial, they are as capable as regular jurors of considering the evidence admitted in the guilt phase, and quite as likely to entertain "residual doubts" and weigh them in the defendant's favor.

113

*Hutton*, 53 Ohio St. 3d at 45, 59 N.E.2d at 443.

The state court's conclusion is reasonable,[24] and this claim fails.

### J.    *Twelfth Ground for Relief: Proportionality*

In his twelfth ground for relief, Hutton asserts that the Ohio courts "have not performed any meaningful proportionality review as is required by Ohio's statutory death penalty scheme." (ECF No. 66, 86-91.)  Specifically, he complains that Ohio courts "typically" limit comparison of capital defendants' cases to other cases in which the death penalty was imposed based upon the same aggravating circumstances, ignoring cases with similar facts where the death penalty was not imposed and failing to take into account that the comparison cases may have additional aggravating circumstances or less mitigating factors.  (*Id*. at 86.)

### 1.    Procedural Posture

Hutton states that he raised this issue on both direct and collateral appeals to the state courts, and the claim is therefore ripe for review.  (*Id*.)  Respondent argues that Hutton failed to appeal the claim to the Ohio Supreme Court on direct review and the claim is therefore abandoned and procedurally defaulted.  (ECF No. 64, 95.)

_____

[24]    In light of the Ohio Supreme Court's analysis of federal law, the Court rejects Hutton's argument that the state court did not adjudicate his federal claim relating to the alternate juror on the merits, and therefore the Court must review this claim de novo with no AEDPA deference.  (ECF No. 66, 71.)  Moreover, the Supreme Court recently explained in *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (Feb. 20, 2013), that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits" and apply AEDPA deference under § 2254(d).  *See also Moreland v. Bradshaw*, 699 F.3d 908, 922 (6th Cir. 2012) (noting that AEDPA deference appears to be required "where a federal issue has been raised but the state court denied the claim with a discussion solely of state law").  While this presumption is rebuttable "in some limited circumstances," *Johnson*, 133 S.Ct. at 1096, the Court does not find such circumstances present here.  Finally, Hutton's due process claim regarding the dismissal of the juror would fail even were the Court to review it de novo.

The Court finds that Hutton did, in fact, raise this claim on direct and post-conviction review.  (App. to Return of Writ, vol. 3, 38; vol. 6, 21; vol. 10, 142; vol. 11, 136.)  The Ohio Supreme Court conducted an independent sentence evaluation as required by Ohio Rev. Code § 2929.05(A) and found Hutton's sentence appropriate and proportionate to death sentences approved in "similar cases" with felony-murder kidnapping and multiple-murder specifications. *Hutton*, 100 Ohio St. 3d at 191, 797 N.E.2d at 963.  This claim is preserved and ripe for review.

### 2.    Merits

The United States Constitution does not require proportionality review.  *See, e.g., Pulley v. Harris*, 465 U.S. 37, 50-51 (1984); *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001). Moreover, the Sixth Circuit has declared:

> Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison.  By limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed.

*Buell*, 274 F.3d at 369.

The Ohio Supreme Court's finding was not contrary to, or an unreasonable application of, federal law, and this claim also fails.

### K.    *Thirteenth Ground for Relief:  Cumulative Error*

Hutton asserts in his thirteenth ground for relief that the cumulative effect of all the constitutional errors he alleges has deprived him of a fair trial and penalty-phase hearing.  (ECF No. 60, 47; No. 66, 91-95.)  Hutton claims that he did not raise this issue in state court.  (ECF No. 66, 91.)  Respondent states that Hutton raised a similar claim on direct appeal, but that this habeas claim is different and therefore procedurally defaulted.  (ECF No. 64, 96.)

The Court will not engage in a procedural-default analysis, however, because this claim

is meritless.  This claim is not cognizable on habeas, as the Supreme Court has not "'held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief.'"  *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (quoting *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002)); *see also Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue").  Moreover, because Hutton has not established that any individual error occurred in the state courts, he cannot show that the cumulative error violated his constitutional rights.  *See Keith*, 455 F.3d at 679.

**VII.    Certificate of Appealability Analysis**

This Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Hutton's grounds for relief.  The Sixth Circuit has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Hutton presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

116

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id*. at 483.  Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id*. at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the

117

denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief 2 (*Brady* claim), 9 (sympathy instruction), 10 (dismissal of juror), and 11(ineffective assistance of appellate counsel).  No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief 1(ineffective assistance during guilt phase), 4 (sufficiency of the evidence), and 8 (trial court's failure to define "aggravating factors"), because they are unequivocally procedurally defaulted.

Finally, the Court will not issue a COA for grounds for relief 12 (proportionality) and 13 (cumulative error).  These claims occur almost *pro forma* in capital habeas petitions but are routinely rejected.  Reasonable jurists would agree with this finding.

This Court will issue a COA for the following sub-claims asserted under ground for relief 3 relating to Hutton's ineffective assistance of trial counsel during the penalty phase: failure to investigate and present available mitigation evidence, and failure to object to the admission of the PSI and to the prosecutor's reference to his criminal record contained in the PSI.  A COA will not issue for ground 3's remaining sub-claims.  A reasonable jurist could debate this Court's conclusion on the merits of both sub-claims.

The Court also will issue a COA for grounds for relief 5 and 7, both asserting prosecutorial misconduct based on improper references to Hutton's prior criminal record, and ground for relief 6, relating to the trial court's admission of evidence of Hutton's alleged rape of Eileen Sweeney.  A reasonable jurist could debate this Court's conclusion on the merits of those claims as well.

**VIII.    Conclusion**

For the foregoing reasons, the Petition is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to the sub-claims specified above asserted under ground for relief 3, and grounds for relief 5, 6, and 7, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only.  As to all remaining claims, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED.**

**s/ Christopher A. Boyko**
**CHRISTOPHER A. BOYKO**
**UNITED STATES DISTRICT JUDGE**

**DATED:  June 7, 2013**